UNITED STATES, Appellee,

v.

Nancy J. VARRASO, Specialist Five
U.S. Army, Appellant.

No. 46,216.

CM 441203.

U.S. Court of Military Appeals.

Dec. 23, 1985.

Certiorari Denied April 21, 1986.
See 106 S.Ct. 1645.

For Appellant: *Martin S. Cosgrove*, Esquire (argued); *Colonel William G. Eckhardt, Captain Thomas J. Feeney, Captain Bernard P. Ingold* (on brief); *Colonel R. Rex Brookshire II, Major Patrick F. Crow, Captain John D. Martin.*

For Appellee: *Captain Richard G. Mann, Jr.* (argued); *Colonel James Kucera, Lieutenant Colonel John T. Edwards, Captain Thomas E. Booth* (on brief); *Lieutenant Colonel Adrian J. Gravelle* and *Captain Gary L. Hoffman.*

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial with officer members tried appellant on the charge that, "with premeditation," she had "murder[ed] Private First Class Tammy Meza-Luna ... by tying her hands behind her back with a belt, placing a rope around her neck and hanging her," in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918. Varraso pleaded not guilty; but, except for the words "with premeditation," she was found guilty as charged. Her sentence was a dishonorable discharge, confinement at hard labor for 8 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved this outcome; and the Court of Military Review affirmed.

15 M.J. 793 (1983).

In petitioning this Court for review appellant assigned seven issues, but review was granted only to consider:

WHETHER THE MILITARY JUDGE ERRED BY NOT INSTRUCTING THE COURT ON INTERVENING CAUSE EVEN THOUGH SUCH DEFENSE HAD BEEN RAISED, AND THE IN-

STRUCTION WAS REQUESTED BY THE TRIAL DEFENSE COUNSEL.

## I

### A

At about 2:00 a.m. on September 29, 1980, Specialist Five Manuel Meza-Luna found his wife, Private First Class Tammy Meza-Luna, hanging from a rope which went over a tree branch and was tied to the base of another tree.[1] Her body was leaning forward at an angle; and her knees were bent so that her height was reduced from an erect position by about two inches. He untied the rope from the base of the tree, loosened the noose around her neck, and noticed that her hands had been tied behind her back with a military belt.

Subsequent medical examination of Tammy's body indicated that she had died between 8:00 and 10:00 p.m. on September 28, 1980, as a result of asphyxia from hanging. Dr. Faruk Presswalla, Deputy Chief Medical Examiner, observed marks around her neck which indicated that the noose had not been tightened. In his opinion, Tammy could have died "from asphyxiation by hanging even though her feet" were "touching the ground"; and he concluded that the asphyxiation was caused by suspension hanging and not by manual or ligature strangulation. He found no wrist chafing or other marks which would have indicated that a struggle had occurred when Tammy's wrists were tied with a regulation Army belt.

At trial, the following facts leading to Tammy's death were revealed. Prior to Tammy's death, appellant had maintained a lesbian relationship with Specialist Four Rebecca Smith. However, on the evening of Saturday, September 27, Becky told her roommate "that she didn't want to be a homosexual" and "that she was being physically" and sexually abused by appellant. Tammy Meza-Luna also heard Becky's complaints and offered to help

Becky get away from appellant. Later that same evening, Tammy entered into a homosexual relationship with Becky; and, because this came to his attention, the detachment commander directed Becky to stay in different quarters.

On the afternoon of Sunday, September 28, when appellant and Tammy visited Tammy's husband, Manuel Meza-Luna, he and Tammy got into a fight, which appellant helped stop. Then Tammy found a knife and threatened to kill her husband and herself. Later, she again took the knife and threatened to cut her throat; but Manuel took the knife from her "without a struggle." Before leaving with appellant, Tammy told her husband that she would be dead the "next time ... [he] saw her." However, he did not believe her because of her previous ineffectual attempts at suicide.

At about 3:00 p.m. appellant and Tammy went to the quarters where Becky Smith was staying. There a disturbance resulted; the two visitors were pushed outside, and military police brought them back to their own barracks. When she arrived there, appellant was "very upset about something" and "was arguing and fussing." The detachment commander "restricted [appellant] to the company area"; and soon thereafter she telephoned the company's orderly room and "said that they was going to kill themselves."

Thereupon, the charge of quarters, Private First Class Charles L. Huff, started over towards the female barracks; and enroute he "ran into Specialist Knight," who "said he had seen the girls going toward the woods with a rope." Huff "went out toward the woods" to search for them and saw "them up on this tree" with a rope approximately ¾ of an inch in diameter. After this interruption, appellant and Tammy returned to their barracks. Huff was on duty through the night, but he heard no "cries for help or" other "unusual noise[s]."

---

1. Various photographs which were admitted in evidence depict the scene, the deceased, and the rope.

Although appellant did not take the stand at her trial, her version of the events was presented by a statement she made to an investigator on September 30.[2] According to this document, Varraso agreed with Tammy "to commit suicide"; and they went into the woods behind their barracks with a rope. Because of an interruption, they went back into the barracks, where they attempted unsuccessfully to commit suicide by drinking a mixture of Drano and water. Appellant went to sleep but was awakened by Tammy, who requested help in hanging herself. By this time Varraso had undergone "a change in heart about committing suicide." However, she went out with Tammy and "put the loop around her" neck with "about 3 inches of slack between the rope and her neck." Then, after saying "I still don't believe you are going to do" it and after kissing Tammy on the forehead, appellant "returned to ... [her] room in the barracks and went to sleep." Subsequently, she learned Tammy was dead.

### B

Prior to findings, the military judge discussed his proposed instructions with counsel. In the judge's view, lesser-included offenses of unpremeditated murder, voluntary manslaughter, and negligent homicide had been raised by the evidence; but assault had not been. Furthermore, all of the offenses had these "three common elements": (1) the victim was dead; (2) her death resulted from appellant's acts or omissions; and (3) the killing was unlawful.

Defense counsel requested the following instruction on intervening cause:

If there was an intervening cause between acts or omissions of the accused and the death of the deceased, the accused cannot be held responsible for the deceased's death. Such an intervening cause is defined as an independent cause which intervenes between the original wrongful act or omission and the injury which turns aside the natural sequence of events, and produces a result which would not otherwise have followed from the act or omission and which could not have been reasonably anticipated. In determining what could have been reasonably anticipated you are instructed to consider what a reasonable person would anticipate under the circumstances known to him at the time of the alleged act or omission.

In discussing this requested instruction with the judge, individual defense counsel explained:

I would like an instruction on intervening cause to the extent that if the court would find or the jury would find that the deceased was in an area in a position from which she could extricate herself or could rescue herself and then intentionally went forward, slumped forward and killed herself, then that would be a separate intervening cause.

*   *   *   *   *   *

You have a person who has a suicidal mind and it has no relationship.

The military judge responded that, even if the deceased "had a suicidal mind," any acts on her part which led to her death were foreseeable. Therefore, he denied the requested instruction.[3]

After counsel argued on findings, the judge proceeded to instruct in the manner he had described to counsel. Initially, he advised the members that to convict appellant of any offense they must find that Tammy's

death resulted from the acts and omissions, or failure to act, of the accused on 28 September 1980, at Fort Story, Virginia, by tying Meza-Luna's hands behind her with a belt, placing a noose around Meza-Luna's neck, and leaving her in an isolated area in a position from which the

---

2. *See* Appendix (consisting of pros. ex. 2 and 3) to this opinion.

3. Defense counsel also unsuccessfully requested an instruction that "if you find as a fact that the deceased committed suicide, you must find the accused not guilty."

deceased could not rescue herself, and without notifying anyone.

He also explained:

The question of whether the accused was assisting Tammy Meza-Luna to commit suicide is not directly involved in this case. The government's theory is the direct effect of the accused's acts in tying Tammy Meza-Luna's hands, placing a noose around her neck, and leaving her in an isolated area from which she could not rescue herself, was to directly cause the victim to hang. Even in jurisdictions where aiding, abetting, or counseling suicide is not a crime, a person is not justified in taking the life of one who desires to die. Consequently, unless you find beyond a reasonable doubt, Nancy Varraso set into motion a chain of events, which alone or together with other factors, played a material or substantial role in Tammy Meza-Luna's death you cannot convict her.

The inclination, if any, of Tammy Meza-Luna to commit suicide should be considered by you along with all other evidence in determining if the chain of events leading to her death could have been stopped or not. It is for you to make this decision, bearing in mind the government's burden to show the fact that she did not suicide, [sic] but was inextricably caught in the chain mentioned before. The accused is responsible if her acts caused the victim to kill herself intentionally or by her negligence.

The military judge then instructed that conviction of premeditated murder required proof that appellant had formed "a specific intent to kill accompanied by consideration of the act or omission intended to bring about the death" and that "she had this premeditated design to kill for a period of time, however brief, and then either did the alleged acts or omitted to act which resulted ultimately in Meza-Luna's death." For unpremeditated murder, it was necessary for the Government to establish "that at the time of the killing the accused had the intent to kill or inflict great bodily harm

upon" the deceased. For involuntary manslaughter the unique element was that "the act or failure to act" which caused the victim's death "amounted to culpable negligence." For negligent homicide the distinctive elements were "that the act or omission of the accused which caused the death of Tammy Meza-Luna, constituted simple negligence" and that "under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces."

To further clarify the concept of causation the judge advised:

Now I have told you that the accused's acts or omissions need not be the sole cause of death nor the latest or most immediate cause of death. I also said that they must be such as to play a substantial or material role in the victim's death. But what role should the victim's acts play? You should and must consider the victim's acts in determining if there is proximate cause between the accused's acts and the results; death of the deceased, Tammy Meza-Luna. You must find that an act or omission of the accused beyond a reasonable doubt, played a material role in Tammy Meza-Luna's decease. So obviously Tammy Meza-Luna's actions must be considered by you in determining that fact. Again, I note the accused is responsible if her acts were a contributing proximate cause.

## II

■ Article 118 of the Uniform Code declares that anyone is guilty of murder, who, without justification or excuse, *unlawfully kills* a human being, when he—

(1) has a premeditated design to kill;

(2) intends to kill or inflict great bodily harm;

(3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; or

(4) is engaged in the perpetration or attempted perpetration of burglary,

sodomy, rape, robbery, or aggravated arson.

(Emphasis added.)

According to Article 119, "[a]ny person ... who, with an intent to kill or inflict great bodily harm, *unlawfully kills* a human being in the heat of sudden passion caused by adequate provocation is guilty of voluntary manslaughter"; and

[a]ny person ... who, without an intent to kill or inflict great bodily harm, *unlawfully kills* a human being—

(1) by culpable negligence; or

(2) while perpetrating or attempting to perpetrate

certain "offense[s] directly affecting the person; is guilty of involuntary manslaughter." (Emphasis added.)

Because all these offenses require an unlawful killing of a victim, there is no basis for concluding that the causation requirement for premeditated murder differs from that applicable to involuntary manslaughter. Although negligent homicide is not defined by the Uniform Code, the same concept of causation would also apply to it. Accordingly, if the instruction on intervening cause requested by defense counsel requires appellant's exoneration with respect to murder, it would equally require her acquittal with respect to involuntary manslaughter or negligent homicide.

Under the circumstances of this case, such a result would be rather extraordinary. Moreover, it would be contrary to the rationale of our decisions upholding convictions for involuntary manslaughter or negligent homicide where the accused had provided drugs to the deceased.[4] For here the foreseeability of death seems even greater than in those cases.

In all of those cases we relied on this definition of "proximate cause":

To be proximate, an act need not be the sole cause of death, nor must it be the immediate cause—the latest in time and space preceding the death. But a contributing cause is deemed proximate only if it plays a material role in the victim's decease. *See United States v. Houghton*, 13 U.S.C.M.A. 3, 32 C.M.R. 3 (1962); 1 Warren, *Homicide* § 59 (perm. ed. 1938); 1 Wharton, *Criminal Law and Procedure* § 290 (1957).

*United States v. Mazur*, 13 M.J. 143, 145 (C.M.A.1982), quoting from *United States v. Romero*, 1 M.J. 227, 230 (C.M.A.1975). Under that definition, appellant's conduct fully qualified as a proximate cause of the death of Tammy Meza-Luna. Alone, Tammy could not have positioned the rope and noose so that they would strangle her; and she could not have securely tied her hands behind her with the belt. Thus, Varraso's participation was indispensable in causing her death.

Moreover, the judge's instructions imposed on the Government a burden greater than that of providing the means whereby subsequently the deceased could—by her own choice—cause her death. He explained that the Government's theory was that appellant had left Tammy "in an isolated area in a position from which [she] the deceased could not rescue herself, and without notifying anyone." He referred to "the Government's burden to show ... that she did not suicide, [sic] but was inextricably caught in the chain mentioned before."

"At common law suicide was a felony"; and "[f]elonious homicide" was "the killing ... without justification or excuse ... [of] one's self, or another." *State v. Willis*, 255 N.C. 473, 121 S.E.2d 854, 855 (1961). Accordingly, "one who aids and abets another in, or is an accessory before the fact to," suicide had committed a crime. *Id.* at 856. However, in some jurisdictions—because of the abrogation of the common law or for other reasons—suicide is no longer an offense[5]; and so criminal liability cannot

---

4. *United States v. Mazur*, 13 M.J. 143 (C.M.A. 1982); *United States v. Moglia*, 3 M.J. 216 (C.M. A.1977); *United States v. Romero*, 1 M.J. 227 (C.M.A.1975).

5. Nonetheless, in *Willis* the Supreme Court of North Carolina held that attempted suicide is a crime; however, the Air Force Board of Review reached the opposite conclusion under the Uniform Code. *United States v. Walker*, 20 C.M.R. 931 (1955).

be predicated on aiding and abetting accomplishment of a suicide.

A few jurisdictions, though, retain the common-law view that one who aids and abets a suicide is a principal in the second degree to the self-murder of another. *See In re Joseph G.*, 34 Cal.3d 429, 194 Cal. Rptr. 163, 166, 667 P.2d 1176, 1179 (1983). "Some jurisdictions instead classify aiding suicide as a unique type of manslaughter. But the predominant statutory scheme, and the one adopted in California, is to create a sui generis crime of aiding and abetting suicide." (Footnotes omitted.) In these jurisdictions, "the key to distinguishing between the crimes of murder and of assisting suicide is the active or passive role of the defendant in the suicide. If the defendant merely furnishes the means, he is guilty of aiding a suicide; if he actively participates in the death of the suicide victim, he is guilty of murder." *See id.* 194 Cal.Rptr. at 167, 667 P.2d at 1180; *cf. State v. Cobb*, 229 Kan. 522, 625 P.2d 1133 (1981).

If the Uniform Code separately prohibited aiding a suicide, it might be arguable that conduct like appellant's—if intended to assist a suicide—would not be murder and that an instruction to this effect would be necessary. However, because the Code makes no provision for such an offense, we believe the legislative intent was to subsume such conduct under murder.

In dealing with a defendant who had caused death in the attempted execution of a suicide pact, the California Supreme Court concluded in a unanimous opinion that, although its murder statute applied to the case, only a conviction for assisting a suicide should be allowed. We acknowledge a similar temptation in the present case to decide that appellant could only be convicted of a lesser-included offense—

namely, involuntary manslaughter. However, rather than judicially rewrite the Code, we prefer to rely on reviewing authorities to reduce the sentence in cases where convictions of murder pursuant to a literal application of Article 118 might produce an unduly harsh result.[6]

The instructions given by the military judge properly differentiated the homicide offenses applicable to the evidence before them. The element of causation common to all of these offenses was properly explained. Therefore, we must reject appellant's claim of instructional error.[7]

### III

■ Even though this Court granted review only on an issue concerning the instruction, we also have carefully considered the legal sufficiency of the evidence to establish appellant's intent that Tammy Meza-Luna be killed or seriously injured. The record leaves unclear why appellant might have wanted such unfortunate results. Was she seeking to eliminate or punish a rival for the affections of a lesbian lover? Was she merely sympathetic with Tammy's desire to end what had apparently become a troubled and unhappy life? Was there some other motive?

The Government, however, was required only to prove appellant's intent—and not her motive. *Cf. United States v. Kastner*, 17 M.J. 11 (C.M.A.1983).[8] For this, the evidence sufficed. The court members could reasonably have inferred from the manner in which Tammy's hands had been tied and the noose placed around her neck that she had been rendered completely helpless by appellant. Moreover, because under the circumstances Tammy's death was so natural and probable a consequence of appellant's conduct, the members also could

---

**6.** Under the language of Article 118 an accused who has killed another pursuant to a suicide pact might be subject to conviction for premeditated murder with a minimum sentence of life imprisonment.

**7.** At one point the judge advised the members that "[t]he accused is responsible if her acts caused the victim to kill herself *intentionally or by her negligence*." (Emphasis added.) It is un-

clear whether the last five words of this sentence refer to appellant's intent or negligence or instead to the deceased's. No clarification was requested; and any ambiguity was remedied by other instructions.

**8.** Of course, proof of motive often is valuable in showing intent.

have inferred that appellant wished to achieve this result. Appellant's subsequent statement to the investigator disclaims any intent to cause Tammy's death; but, in the face of the other evidence, the factfinders were not bound to believe appellant's self-serving assertion.

9. Apart from any question of diligence, none of the evidence in the petition would be likely to

## IV

The decision of the United States Army Court of Military Review is affirmed. The petition for new trial is denied.[9]

Judge COX concurs.

change the result if there were a new trial.

## APPENDIX

### RIGHTS WARNING PROCEDURE/WAIVER CERTIFICATE
For use of this form, see AR 190-30; the proponent agency is the Office of the Deputy Chief of Staff for Personnel.

#### DATA REQUIRED BY THE PRIVACY ACT

**AUTHORITY:** Title 10, United States Code, Section 3012(g).

**PRINCIPAL PURPOSE:** To provide commanders and law enforcement officials with means by which information may be accurately identified.

**ROUTINE USES:** Your Social Security Number is used as an additional/alternate means of identification to facilitate filing and retrieval.

**DISCLOSURE:** Disclosure of your Social Security Number is voluntary.

| LOCATION | DATE | TIME | FILE NUMBER |
|---|---|---|---|
| Fort Story, Va | 29 Sep 80 | 1344 | |

| NAME (Last, first, middle) | SOCIAL SECURITY NUMBER | GRADE/STATUS |
|---|---|---|
| VARRASO, Nancy Jean | 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 | SP5 |

**ORGANIZATION OR ADDRESS**
309th Trans Det, Fort Story, Va

#### RIGHTS WAIVER CERTIFICATE

##### RIGHTS

The investigator whose name appears below told me that he is with the United States Army ___CID___ as a Special Agent _____ and wanted to question me about the following offense(s) of which I am suspected/accused: ___Murder___

Before he asked me any questions about the offense(s), however, he made it clear to me that I have the following rights:

1. I do not have to answer any questions or say anything.

2. Anything I say or do can be used as evidence against me in a criminal trial.

3. (For personnel subject to the UCMJ) I have a right to talk to a lawyer before or after questioning or have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for, and if necessary, I pay for, or a military lawyer detailed for me at no expense to me. Also, I may ask for a military lawyer of my choice by name and he will be detailed for me if his superiors determine he is reasonably available.

3. (For civilians not subject to the UCMJ) I have a right to talk to a lawyer before or after questioning or have a lawyer present with me during questioning. If I cannot afford a lawyer and want one, arrangements will be made to obtain a lawyer for me.

4. If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time or speak to a lawyer before answering further, even if I sign the waiver below.

##### WAIVER

Understanding my rights as stated above, I am now willing to discuss the offense(s) under investigation without a lawyer being present.

**WITNESSES** (If available):

_signature_
SA ROBERT DARLING
Ft Eustis Field Office, First Region,
USACIDC, Ft Eustis, VA
Organization or address and phone

Organization or address and phone

Signature of interviewee _signature_

Signature of investigator _signature_
JAMES H. HATCHER, SA
Typed name of investigator
Ft Eustis Field Office, First Region,
USACIDC, Ft Eustis, Va 23604
Investigator's organization

##### NON-WAIVER

I do not want to give up my rights:

☐ I want a lawyer.

☐ I do not want to be questioned or say anything.

Signature of interviewee

ATTACH THIS WAIVER CERTIFICATE TO ANY SWORN STATEMENT (DA FORM 2823) SUBSEQUENTLY EXECUTED BY THE SUBJECT SUSPECT/ACCUSED.

**DA FORM 3881** 1 MAY 78

REPLACES DA FORM 3881, 1 JUL 72, AND DA FORM 3881-R, 1 APR 77, PRIVACY ACT STATEMENT, WHICH ARE OBSOLETE.

PROSECUTION EXHIBIT 2 FOR IDENTIFICATION

For use of this form, see AR 190-45 the proponent agency is Office of the Deputy Chief of Staff for Personnel.

| LOCATION | DATE | TIME | FILE NUMBER |
|---|---|---|---|
| Fort Story, VA | 30 Sep 80 | | |

| LAST NAME, FIRST NAME, MIDDLE NAME. | SOCIAL SECURITY NUMBER. | GRADE/STATUS |
|---|---|---|
| VARRASO, Nancy Jean | 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 | SP5 |

**ORGANIZATION OR ADDRESS**
309th Trans Det, Fort Story, VA

I, Nancy J. VARRASO, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

Between 1600-1800, 28 Sep 80, PFC MEZA-LUNA and I entered the 309th Trans Det billets, building 847, Ft Story, VA, and went to my room #2. Within five minutes of entering my room she and I discussed committing suicide together, due to my depressed state, because of constant conflicts with my lesbian lover and company personnel. I agreed with PFC MEZA-LUNA to commit suicide. PFC MEZA-LUNA did not state specifically her reason for wanting to commit suicide. PFC MEZA-LUNA exited my room and about five minutes later Tammy MEZA-LUNA called to me from the hallway and stated, "come on I have a rope." I do not know where she got the rope from. The rope was an off white color, the type used with marine equipment. I accompanied Tammy to a sandy area in the woods behind our barracks, where Tammy picked a tree with one long thick branch. After about four or five attempts we got the rope over the branch. Tammy had one end of the rope which did not have any loop on it. I had the other end of the rope which had a loop and a fixed knot already in it. Tammy said, "oh shit," and dropped her end of the rope. She reached down and got a section of a tree branch. As Tammy was picking up the tree branch, I saw SSG Danny PERKINS approaching the area. I picked up the looped end of the rope and Tammy placed the branch through the loop. Tammy then looped the other end of the rope and attached it to the other end of the branch. I then stepped on the branch and began swinging to conceal our purpose with the rope. SSG PERKINS questioned our activity. I replied that we were making a swing. SSG PERKINS stated something about me being restricted to the barracks, so all three of us returned to the barracks. I escorted SSG PERKINS through the barracks and out the front door. I watched him leave the barracks area for about 5 minutes. Meanwhile Tammy was in the cleaning storage supply room looking for some type of poison. I entered the storage room and she had a can of crystal drano. We decided to commit suicide by mixing the drano with water and drinking it. We went to the bathroom and mixed up the drano with water. We attempted to drink it but it gave us a burn. A few minutes later I went to sleep. I think it was about 2000, 28 Sep 80, when I went to sleep. Between 2100-2200, 28 Sep 80, I was awaken by Tammy. Prior to the time that I went to sleep Tammy was wearing a print blouse with a collar and blue jeans. When she woke me up she was wearing my blue T-shirt with the word "ENEWETAK" printed on it and I don't recall what color or type pants she was wearing. I asked why she woke me up and she replied, "I'm gonna hang myself." I said "no you're not, don't act stupid." She then said, "Please help me do it and put me out of my misery." She kept pleading with me to help her and I agreed to help her. I felt that if I went with her that she would not go through with it. I want to add that the drano that we had attempted to drink earlier gave us a burning sensation in our mouths and we spit it out and did not drink it. I put the drano can back in the supply room and Tammy removed the rope from the tree in the wooded area where we got caught by SSG PERKINS. Prior to going to sleep Tammy came into room #4 assigned to Deborah SWINNEY where I was. Tammy came into the room and laid down on a separate bed and we discussed our attempt to commit suicide. I told her that I felt that I had a change in heart about

| EXHIBIT | INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 3 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF___ TAKEN AT___ DATED___ CONTINUED." THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT AND BE INITIALED AS "PAGE___OF___PAGES." WHEN ADDITIONAL PAGES ARE UTILIZED, THE BACK OF PAGE 1 WILL BE LINED OUT, AND THE STATEMENT WILL BE CONCLUDED ON THE REVERSE SIDE OF ANOTHER COPY OF THIS FORM.

**DA FORM 2823** 1 JUL 72  SUPERSEDES DA FORM 2825, 1 JAN 68, WHICH WILL BE USED.

PROSECUTION EXHIBIT 3 FOR IDENTIFICATION

**138**

committing suicide. Tammy did not comment at all about her feeling about continuing her attempts to commit suicide. We then went into room #2. We laid down together on my bed and within a few moments I was sleep. Now getting back to going out of the barracks with her we did not turn on any lights in my room and the lights in the wallway were not on. We exited the barracks about twenty minutes after she woke me up, I do not recall exactly what she was wearing other than my blue T-Shirt which had the writing printed on it. We went to the same clearing in the wooded area behind our barracks where we had attempted to commit suicide earlier that night. Upon arriving at the area I noticed that a rope was hanging from a tree and that the rope had a knotted loop. Tammy asked me to tie her hand with a dark colored belt, which I did. She then walked over to the area of the rope and asked me to put the loop around her head. I put the loop around her head and there was about 3 inches of slack between the rope and her neck. I said "Tammy I still don't believe you are going to did this, so I'm going back to bed." She then replied, "Please leave, I love you." I said, "I love you to lady," and I kissed her on the forehead. I then left her there and returned to my room in the barracks and went to sleep. I awoke about 0450, 29 Sep 80, got dressed in my duty fatigue uniform. About 0535, 29 Sep 80, I went to the 309th Trans Det orderly room. About 0640, 29 Sep 80, I went back into my barracks to the latrine area and PVT SWINNEY asked if she could borrow my fatigue uniform belt stating that hers was missing, and I told her no. It was then that I realized that Tammy may have committed suicide, because I thought that it was a belt I tied Tammy's hands with. About 0645, 29 Sep 80, I went to Fort Eustis, VA with a company detail. I did not look for Tammy between the time I got up and the time I left for Fort Eustis, VA. Upon my return to Fort Story I heard that a female body was found hanging from a tree, I then knew that she had committed suicide.

Q. Did you tell anyone before you left for Ft Eustis what Tammy had on her mind?
A. No.
Q. Did you tell anyone where you had left Tammy?
A. No.
Q. When you left Tammy what was she doing?
A. Just standing there with the rope around her neck.
Q. Did you hear any screams or crys as you left the area?
A. No.
Q. Was Tammy under the influence of any type of drugs or alcohol when you both went out to the area where the rope was?
A. Yes, qualudes, tylenol #3, and lots of beer.
Q. What about you?
A. All I drank that day was six beers, between 9:00 AM and 3:00 PM, 28 Sep 80.
Q. Where did the rope that was in the tree come from that she asked you to put around her neck?
A. I don't know.
Q. How long was the rope, and the color?
A. I don't know it was too dark.
Q. Do you know what time it was that you left Tammy in the woods?
A. Sometime between 9:00 PM to 10:00 PM.
Q. When you kissed Tammy as you left didn't you feel that she might do something to herself?
A. No, she tried so many times before I just did not believe her.
Q. In the same manner?
A. I don't know if she has tried this.
Q. Did you ever assist her in a suicide attempt before?
A. No, personnally I don't believe in it.

INITIALS OF PERSON MAKING STATEMENT _____      PAGE 2 OF 3 PAGES

**STATEMENT (Continued)**

Q. When you returned to the barracks did you meet anyone?
A. No.
Q. Did you and Tammy meet anyone when you both went out to the tree the second time?
A. No.
Q. In that you don't believe in suicide why did you put the rope around the neck of Tammy?
A. Because I was drougy (sleepy) and I didn't believe she would do it.
Q. Did you have any grudges against Tammy for anything?
A. No.
Q. Did you ever have an affair with Tammy?
A. No, but that's what her husband thought. I did not even know what was going on between her and Becky.
Q. Tammy did tell you thought about her and Becky?
A. Yes, on Sunday morning that's why we stayed up so late.
Q. What was your reaction to what she told you?
A. I had given up at that point and I did not have any reaction, and I told Tammy that she could have Becky.
Q. Weren't you hurt by this at all?
A. I was very hurt but what could I do?
Q. Would you have really killed yourself if you and Tammy were not stopped the first time.
A. Probably.
Q. How were you going to do it?
A. I would have put a noose around my neck and one around her and did it that way.
Q. Did Tammy leave any type of note?
A. Not that I know of.
Q. Did Tammy ask you to help her kill herself?
A. Yes when she woke me up she about pleaded with me.
Q. Is there anything you wish to add to your statement?
A. Yes, that I did not think that she would do it and I left her enough room that she could have gotten out of it.
Q. Anything further you wish to add?
A. No. ////////////END OF STATEMENT///////

---

**AFFIDAVIT**

I, _____Nancy Jean VARRASO_____ HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1 AND ENDS ON PAGE __3__ . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_(Signature of Person Making Statement)_

**WITNESSES:**

JAMES H. HATCHER,
Fort Eustis Field Office
Fort Eustis, VA 23604
**ORGANIZATION OR ADDRESS**

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 30th day of __September__ , 19 80 at __Fort Story, VA__

_(Signature of Person Administering Oath)_

ROBERT B. DARLING, SA
_(Typed Name of Person Administering Oath)_

Article 136 (b) (4), UCMJ
_(Authority To Administer Oaths)_

**ORGANIZATION OR ADDRESS**

**INITIALS OF PERSON MAKING STATEMENT**

PAGE 3 OF 3 PAGES

U. S. Government Printing Office: 1979—289-962/9386