[Crim. No. 22966. Aug. 29, 1983.]

In re JOSEPH G., a Person Coming Under the Juvenile Court Law.
WILLIAM FORDEN, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
JOSEPH G., Defendant and Appellant.

COUNSEL

Bernard Meyerson for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Joseph G., a minor, was charged in a juvenile court petition to declare him a ward of the court (Welf. & Inst. Code, § 602) with murder (Pen. Code, § 187) and aiding and abetting a suicide (Pen. Code, § 401). At the contested adjudication hearing, the court sustained the petition as to the murder count but dismissed the aiding and abetting charge as inapplicable; the court further found that the murder was in the first degree.

In the case before us a genuine suicide pact was partially fulfilled by driving a car over a cliff; the primary issue is whether the survivor, who drove the vehicle, is guilty of aiding and abetting the suicide rather than the murder of his deceased partner. We conclude that, under the unusual, inexplicable and tragic circumstances of this case, the minor's actions fall more properly within the statutory definition of the former (Pen. Code, § 401).

I.

The minor and his friend, Jeff W., both 16 years old, drove to the Fillmore library one evening and joined a number of their friends who had congregated there. During the course of the two hours they spent at the library talking, mention was made of a car turnout on a curve overlooking

a 300- to 350-foot precipice on a country road known as "the cliff." Both the minor and Jeff declared that they intended to "fly off the cliff" and that they meant to kill themselves. The others were skeptical but the minor affirmed their seriousness, stating "You don't believe us that we are going to do it. We are going to do it. You can read it in the paper tomorrow." The minor gave one of the girls his baseball hat, saying firmly that this was the last time he would see her. Jeff repeatedly encouraged the minor by urging, "let's go, let's go" whenever the minor spoke. One other youth attempted to get in the car with Jeff and the minor but they refused to allow him to join them "because we don't want to be responsible for you." Jeff and the minor shook hands with their friends and departed.

The pair then drove to a gas station and put air in a front tire of the car, which had been damaged earlier in the evening; the fender and passenger door were dented and the tire was very low in air pressure, nearly flat. Two of their fellow students, Keith C. and Craig B., drove up and spoke with Jeff and the minor. The minor said, "Shake my hand and stay cool." Jeff urged, "Let's go," shook their hands and said, "Remember you shook my hand." The minor then drove off in the direction of the cliff with Jeff in the passenger seat; Keith and Craig surreptitiously followed them out of curiosity. The minor and Jeff proceeded up the hill past the cliff, turned around and drove down around the curve and over the steep cliff.

Two other vehicles were parked in the turnout, from which vantage point their occupants watched the minor's car plummeting down the hill at an estimated 50 miles per hour. The car veered off the road without swerving or changing course; the witnesses heard the car accelerate and then drive straight off the cliff. No one saw brakelights flash. The impact of the crash killed Jeff and caused severe injuries to the minor, resulting in the amputation of a foot.

Investigations following the incident revealed there were no defects in the steering or brake mechanisms. There were no skid marks at the scene, but a gouge in the pavement apparently caused by the frame of a motor vehicle coming into contact with the asphalt at high speed indicated that the car had gone straight over the cliff without swerving or skidding.

A few weeks after the crash, another friend of the minor discussed the incident with him. The minor declared he had "a quart" before driving over the cliff; the friend interpreted this to mean a quart of beer. The minor told his friend that he had "no reason" to drive off the cliff, that it was "stupid" but that he "did it on purpose." Just before the car went over the cliff, the minor told Jeff, "I guess this is it [Jeff]. Take it easy."

## II.

The minor maintains that, under the peculiar circumstances presented here, he can be convicted only of aiding and abetting a suicide and not of murder. We begin by reviewing the development of the law relevant to suicide and related crimes.

At common law suicide was a felony, punished by forfeiture of property to the king and ignominious burial. (*Tate* v. *Canonica* (1960) 180 Cal.App.2d 898, 901 [5 Cal.Rptr. 28]; Note, *The Punishment of Suicide— A Need for Change* (1969) 14 Vill.L.Rev. 463, 465 (hereafter cited as *Punishment of Suicide*).) Essentially, suicide was considered a form of murder. (Brenner, *Undue Influence in the Criminal Law: A Proposed Analysis of the Criminal Offense of "Causing Suicide"* (1982) 47 Alb.L.Rev. 62, 64 (hereafter cited as *Causing Suicide*).) Under American law, suicide has never been punished and the ancient English attitude has been expressly rejected. (*Punishment for Suicide, supra,* 14 Vill.L.Rev. at p. 465.) Rather than classifying suicide as criminal, suicide in the United States "has continued to be considered an expression of mental illness." (Hendin, Suicide in America (1982) at p. 23.) As one commentator has noted, "punishing suicide is contrary to modern penal and psychological theory." (Victoroff, The Suicidal Patient: Recognition, Intervention, Management (1982) pp. 173-174 (hereafter referred to as Victoroff).)

Currently no state, including California, has a statute making a successful suicide a crime, nor does the Model Penal Code recognize suicide as a crime. (*Causing Suicide, supra,* 47 Alb.L.Rev. at p. 65.) Contemporary England, by abolishing its criminal penalties for suicide, has also adopted this more modern approach. (English Suicide Act of 1961; Barry, *Suicide and the Law* (1965) 5 Melb.U.L.Rev. 1, 7 (hereafter cited as Barry).)

Attempted suicide was also a crime at common law. A few American jurisdictions have adopted this view, but most, including California, attach no criminal liability to one who makes a suicide attempt. The drafters of the Model Penal Code, adhering to the trend of decriminalizing suicide, rationalize that "The judgment underlying the Model Code position is that there is no form of criminal punishment that is acceptable for a completed suicide and that criminal punishment is singularly inefficacious to deter attempts to commit suicide. . . . It seems preposterous to argue that the visitation of criminal sanctions upon one who fails in the effort is likely to inhibit persons from undertaking a serious attempt to take their own lives. Moreover, it is clear that the intrusion of the criminal law into such tragedies is an abuse. There is a certain moral extravagance in imposing criminal punishment on a person who has sought his own self-destruction, who has

not attempted direct injury to anyone else, and who more properly requires medical or psychiatric attention." (Model Pen. Code, § 210.5, (Official Draft & Revised Commentaries 1980) com. 2 at p. 94).) Further, as one commentator has noted, "[t]he current psychiatric view is that attempted suicide is a symptom of mental illness and, as such, it makes no more sense to affix criminal liability to it than to any other symptom of any other illness . . . ." (*Punishment of Suicide, supra,* 14 Vill.L.Rev. at p. 469.) Finally, it has been said that "all modern research points to one conclusion about the problem of suicide—the irrelevance of the criminal law to its solution." (*Id.* at p. 473.)

The law has, however, retained culpability for aiding, abetting and advising suicide. At common law, an aider and abettor was guilty of murder by construction of law because he was a principal in the second degree to the self-murder of the other. (Williams, The Sanctity of Life and the Criminal Law (1957) p. 296 (hereafter cited as Williams).) Most states provide, either by statute or case law, criminal sanctions for aiding suicide, but few adopt the extreme common law position that such conduct is murder.[1] Some jurisdictions instead classify aiding suicide as a unique type of manslaughter.[2] But the predominant statutory scheme, and the one adopted in California, is to create a sui generis crime of aiding and abetting suicide.[3] "This latter structure . . . reflects a fundamental shift in the understanding of the law. Since public morals are no longer imposed upon the would-be suicide, the traditional rationale that would support the proscription of assisting suicide as the assistance of a crime is accordingly eroded." (Englehardt & Malloy, *supra,* 36 Sw.L.J. at pp. 1019-1020.) The modern trend reflected by this statutory scheme is therefore to mitigate the punishment for assisting a suicide by removing it from the harsh consequences of homicide law and

---

[1]*Commonwealth* v. *Hicks* (1904) 118 Ky. 265 [82 S.W. 265] [dicta]; *McMahan* v. *State* (1910) 168 Ala. 70 [53 So. 89]; *People* v. *Roberts* (1920) 211 Mich. 187 [178 N.W. 690, 13 A.L.R. 1253]; *Turner* v. *State* (1908) 119 Tenn. 663 [108 S.W. 1139]; *Commonwealth* v. *Bowen* (1816) 13 Mass. 356; *State* v. *Jones* (1910) 87 S.C. 17 [67 S.E. 160].

[2]Alaska Stat., § 11.41.120; Ariz. Rev. Stat. Ann., § 13-1103; Ark. Stat. Ann., § 41-1504; Colo. Rev. Stat., § 18-3-104; Conn. Gen. Stat., § 53a-56; Fla. Stat. Ann., § 782.08; Hawaii Rev. Stat., § 707-702; N.Y. Penal Law, § 125.15; Ore. Rev. Stat., § 163.125. (See Englehardt & Malloy, *Suicide and Assisting Suicide: A Critique of Legal Sanctions* (1982) 36 Sw.L.J. 1003, 1019 at fn. 71 (hereafter cited as Englehardt & Malloy).)

[3]State statutes which criminalize assisting suicide as a specific offense include: Cal. Pen. Code, § 401; Del. Code Ann., tit. 11, § 645; Ind. Stat. Ann., § 35-42-1-2; Kan. Stat. Ann., § 21-3406; Me. Rev. Stat. Ann., tit. 17-A, § 204; Minn. Stat. Ann., § 609.215; Miss. Code Ann., § 97-3-49; Mo. Ann. Stat., § 565.021; Mont. Code Ann., § 45-5-105; Neb. Rev. Stat., § 28-307; N. H. Stat. Ann., § 630.4; N.J. Stat. Ann., § 2C:11-6; N.M. Stat. Ann., § 30-2-4; N.Y. Penal Law, § 120.30; Okla. Stat. Ann., tit. 21, §§ 813-818; 18 Pa. Cons. Stat. Ann., § 2505; P.R. Laws Ann., tit. 33, § 1385; S.D. Codified Laws Ann., § 22-16-37; Tex. Pen. Code Ann., § 22.08; Wash. Rev. Code Ann., § 9A.36.060; Wis. Stat. Ann., § 940.12 (see Englehardt & Malloy, *supra,* 36 Sw.L.J. at p. 1019, fn. 72).

giving it a separate criminal classification more carefully tailored to the actual culpability of the aider and abettor.

The California aiding statute, in effect since 1873, provides simply that "Every person who deliberately aids, or advises or encourages another to commit suicide, is guilty of a felony." (Pen. Code, § 401.) This statute, although creating a felony, places California among the most lenient jurisdictions in its punishment for those who assist suicide. The sole California decision which even peripherally considers criminal liability for assisting suicide under this statute is *People* v. *Matlock* (1959) 51 Cal.2d 682 [336 P.2d 505]. Although by no means entirely dispositive of the issue presented here, the opinion is reviewed in some depth because of the paucity of apposite decisions.

The defendant in *Matlock* was convicted of murder and robbery. Although admitting that he strangled the victim and took his money, the defendant claimed he did so solely at the victim's insistence. According to the defendant, the victim, who had only six months to live and had been recently convicted of a federal crime, sought a way to die but could not commit suicide without forfeiting the benefits of his insurance policy; the victim therefore induced the defendant to kill him and take his property so that it would appear to be a robbery-murder.

The defendant contended that the trial court erred in refusing his requested instructions on aiding and abetting suicide under section 401 of the Penal Code. Relying on the Oregon decision in *People* v. *Bouse* (1953) 199 Ore. 676 [264 P.2d 800] (overruled on other issues in *State* v. *Brewton* (1964) 238 Ore. 590 [395 P.2d 874, 878] and *State* v. *Fischer* (1962) 232 Ore. 558 [376 P.2d 418, 421]), we held that the defendant's active participation in the final overt act causing the victim's death, i.e., strangling him, precluded the application of the aiding suicide statute.[4]

In *Bouse,* the defendant's wife drowned in a bathtub; there was evidence that she had told the defendant she wanted to die and that he attempted suicide shortly after her death. On the evidence, the jury could have found that the defendant held his wife's head underwater, despite her struggles, until she died, thereby committing murder. On the other hand, the jury might have found that the defendant merely ran the water and assisted his wife into the tub, and was therefore guilty of only manslaughter under the Oregon assisting statute. In upholding the manslaughter instruction, the court reasoned that the latter statute "does not contemplate active partici-

---

[4]Although we found no error on this issue, we did reverse the defendant's conviction on other grounds. (*Id.* at pp. 692-693.)

pation by one in the overt act directly causing death. It contemplates some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about death—the gun, the knife, the poison, or providing the water, for the use of the person who himself commits the act of self-murder. But where a person actually performs, or actively assists in performing, the overt act resulting in death, such as shooting or stabbing the victim, administering the poison, or holding one under water until death takes place by drowning, his act constitutes murder, and it is wholly immaterial whether this act is committed pursuant to an agreement with the victim, such as a mutual suicide pact." (*People* v. *Bouse, supra,* at p. 812; quoted in *Matlock, supra,* 51 Cal.2d 682 at p. 694.)

■ The reference to a suicide pact seems to relate to the evidence that the defendant made a suicide attempt after his wife's death. The type of suicide pact contemplated was apparently of the murder-suicide variety, in which, by mutual agreement, one person kills the other and then kills himself. The court noted that even given the existence of such a pact, if the defendant actively drowned his wife it would be murder. This is to be distinguished from either (1) the mutual suicide pact in which one party provides the means (e.g., poison or lethal weapons) but each individual kills himself independently pursuant to the agreement; or (2) the circumstances of the present case, in which the pact envisions both parties killing themselves simultaneously with a single instrumentality. As will be seen, in both of the latter situations the proper criminal liability to be attached is for aiding and abetting suicide rather than for murder.

Under *Matlock* and *Bouse,* the key to distinguishing between the crimes of murder and of assisting suicide is the active or passive role of the defendant in the suicide. If the defendant merely furnishes the means, he is guilty of aiding a suicide; if he actively participates in the death of the suicide victim, he is guilty of murder. If this literal formulation were to be applied mechanically to the facts in the case at hand, it would be difficult not to conclude that the minor, by driving the car, "actively participated" in the death of his friend Jeff. It must be remembered, however, that *Matlock* did not involve a suicide pact but instead dealt with the more straightforward situation in which a suicide victim is killed as a result of direct injury that the defendant inflicts on him, i.e., strangling. The reasoning which justified the application of the active/passive distinction in *Matlock* is therefore not wholly apposite to the peculiar facts shown here. The present case requires us instead to consider an entirely distinct situation to determine whether the minor's actions fall most appropriately within the conduct sought to be proscribed by Penal Code section 401.

It has been suggested that "[s]tates maintaining statutes prohibiting aiding . . . suicide, attempt to do so to discourage the actions of those who might encourage a suicide in order to advance personal motives." (Note, *Criminal Aspects of Suicide in the United States* (1975) 7 N.C.Cent.L.J. 156, 162.) A further rationale underlying statutes imposing criminal liability is that "the interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another, even though the act may be accomplished with the consent, or at the request, of the suicide victim." (Model Pen. Code, § 210.5, *supra,* com. 5 at p. 100.)[5] Finally, "although the evidence indicates that one who attempts suicide is suffering from mental disease, there is not a hint of such evidence with respect to the aider and abettor. . . . [T]he justifications for punishment apply to the aider and abettor, while they do not apply to the attempted suicide." (*Punishment of Suicide, supra,* 14 Vill.L.Rev. at p. 476, fns. omitted.)

The mutual suicide pact situation, however, represents something of a hybrid between the attempted suicide and the aiding suicide scenarios.[6] In essence, it is actually a double attempted suicide, and therefore the rationale for not punishing those who attempt suicide would seem to apply. "Although there may have been aiding and abetting involved in the suicide pact, the survivor is distinguishable from a nonsuicide pact aider and abettor in the sense that he was also a potential victim." (*Id.* at p. 480.) "Suicides in pursuance of a pact are merely cases of double or multiple suicides. There can be no more justification for punishing an attempted double suicide than for punishing an attempted individual suicide. As in the case of an attempt at individual suicide, punishing the survivor of a genuine pact can serve no deterrent purpose, may hinder medical treatment, and is merely useless cruelty. It can do no more than strengthen the will to succeed in the act of self-destruction." (Williams, *supra,* at p. 305.) Dostoevski wrote, "the law of self-destruction and the law of self-preservation are equally strong in humanity." (Dostoevski, The Idiot (Mod. Lib. ed. 1935) p. 356.) As we have noted, attempted suicide is not a crime in California.

---

[5]The Model Penal Code provisions on causing or aiding suicide are as follows: "(1) *Causing Suicide as Criminal Homicide.* A person may be convicted of criminal homicide for causing another to commit suicide only if he purposely causes such suicide by force, duress or deception. [¶] (2) *Aiding or Soliciting Suicide as an Independent Offense.* A person who purposely aids or solicits another to commit suicide is guilty of a felony of the second degree if his conduct causes such suicide or an attempted suicide, and otherwise of a misdemeanor." (Model Pen. Code, § 210.5.)

[6]Although literature on the topic is sparse, general information on the rare phenomenon of suicide pacts can be found in: Cohen, *A Study of Suicide Pacts* (1961) 29 Medico Legal J. 144-151; Hemphill & Thornhill, *Suicide Pacts* (1969) 43 S. Afr. Med. J. 1335-1338; Rosen, *Suicide Pacts: A Review* (1981) 11 Psych. Med. 525-533; Noyes, et al., *Single Case Study: Conjugal Suicide Pact* (1977) 165 J. Nervous & Mental Diseases 72-75.

On the other hand, it cannot be denied that the individuals involved in the pact aid and abet each other in committing suicide: Although such individuals are thus not totally lacking in blameworthiness, their criminal responsibility would appear to fall far short of the culpability of one who actively kills another at the request of the victim, such as the defendant in *Matlock.* We are thus faced with a dilemma: should one who attempts suicide by means of a mutual suicide pact be liable for first degree murder at one extreme, or at the other, only for aiding and abetting a suicide? The current law in California provides no options save these.[7]

Traditionally under the common law the survivor of a suicide pact was held to be guilty of murder.[8] "Whether the common law rules have been modified by the various state [aiding and abetting suicide] statutes is not entirely clear." (*Punishment of Suicide, supra,* 14 Vill.L.Rev. at p. 479.) It has been suggested that "the reason for imposing criminal liability upon a surviving party to a suicide pact is the 'support' such a pact presents . . . . [¶] Besides the notion of 'support,' . . . [s]urviving a suicide pact gives rise to a presumption . . . that the participant may have entered into the pact in less than good faith. Survival, either because one party backed out at the last minute or because the poison, or other agent, did not have the desired effect, suggests that the pact may have been employed to induce the other person to take his own life." (*Causing Suicide, supra,* 47 Alb.L.Rev. at pp. 85-86.) The Model Penal Code, while recognizing that "when the pact is genuine all of the arguments against treating attempted suicide as criminal apply with equal force" to the case of a suicide pact survivor, is similarly concerned with the "danger of abuse in differentiating genuine from spu-

---

[7]English law deals explicitly with the suicide pact situation by providing that the survivor of such a pact who "aids, abets, counsels or procures" the suicide of another is guilty of aiding and abetting suicide and is punishable by imprisonment for a term not to exceed 14 years. The survivor of a genuine suicide pact who actually kills the other person is guilty of manslaughter rather than murder. The burden is on the defendant to show a genuine suicide pact which is defined by statute as a "common agreement between two or more persons having for its object the death of all of them, whether or not each is to take his own life, but nothing done by a person who enters into a suicide pact should be treated as done by him in pursuance of the pact unless it is done while he has the settled intention of dying in pursuance of the pact." (Parry-Jones, *Criminal Law and Complicity in Suicide and Attempted Suicide* (1973) 13 Med. Sci. & L. 110, 111; see also West, Murder Followed by Suicide (1965) pp. 20-21.) It is interesting to note that since these revisions in 1961 no survivors of suicide pacts have been convicted of manslaughter under English law. (Parry-Jones, *supra,* at p. 119.)

[8]See 13 A.L.R. 1259, 1262; 40, Homicide, American Jurisprudence Second, section 586, page 847; 83 Corpus Juris Secundum, Suicide, section 5, page 784; *Punishment of Suicide, supra,* 14 Vill.L.Rev. at page 479; Barry, *supra,* 5 Melb.U.L.Rev. at page 4; *McMahan v. State, supra,* 53 So. at page 91; *State v. Webb* (1909) 216 Mo. 378 [115 S.W. 998, 1000]; *Burnett v. People* (1903) 204 Ill. 208 [68 N.E. 505, 509]; *Turner v. State, supra,* 108 S.W. at page 1141.

rious agreements" to commit suicide.[9] (Model Pen. Code, § 210.5, *supra,* com. 6, at p. 105; see also Williams, *supra,* at p. 305.)

Under the facts presented here, these concerns are not particularly appropriate. First, the trial judge was satisfied there was a genuine suicide pact between Jeff and the minor. By "genuine," we mean simply that the pact was freely entered into and was not induced by force, duress or deception. (See Model Pen. Code, § 210.5, subd. 1.) There is no evidence in the present case that Jeff's participation in the pact was anything but fully voluntary and uncoerced. Second, because of the instrumentality used there was no danger of fraud: the potential consequences for the minor of driving the car off the cliff were identical to the potential consequences for Jeff, his passenger. Finally, the suicide and the attempted suicide were committed simultaneously by the same act.

These factors clearly distinguish the present case from the murder-suicide pact situation in which one party to the agreement actively kills the other (e.g., by shooting, poison, etc.) and then is to kill himself. The active participant in that scenario has the opportunity to renege on the agreement after killing the other or to feign agreement only for the purpose of disposing of his companion and without any true intention to commit suicide himself. By contrast, in the case at hand the minor and Jeff, because of the instrumentality chosen, necessarily were to commit their suicidal acts simultaneously and were subject to identical risks of death. The potential for fraud is thus absent in a genuine suicide pact executed simultaneously by both parties by means of the same instrumentality.[10] The traditional rationale for holding the survivor of the pact guilty of murder is thus not appropriate in this limited factual situation.

The anomaly of classifying the minor's actions herein as murder is further illustrated by consideration of Jeff's potential criminal liability had he survived. If Jeff, the passenger, had survived and the minor had been killed, Jeff would be guilty, at most, of a violation of Penal Code section 401. In order to commit suicide by this means, i.e., a car, only one of the parties to the pact, the driver, can be said to "control" the instrumentality. To make the distinction between criminal liability for first degree murder and

---

[9]The punishment provisions of the Model Penal Code provide for reducing murder to manslaughter and other means of mitigation; in light of this latitude, the drafters of the code apparently felt it unnecessary to deal specifically with the situation of the survivor of the suicide pact. (Model Pen. Code, § 210.5, *supra,* com. 6 at p. 106.)

[10]As stated in the psychological literature: "If a suicide-pact survivor has unintentionally failed to die and it's accepted that the attempt had genuine lethal intent, punishment for murder is improper since it's assumed that the attempter was a potential victim, is mentally ill, and lacks the evil intent necessary to justify punishment." (Victoroff, *supra,* at p. 176.)

merely aiding and abetting suicide turn on the fortuitous circumstance of which of the pair was actually driving serves no rational purpose. The illogic of such a distinction has been similarly recognized in the classic example of the parties to the pact agreeing to commit suicide by gassing themselves in a closed room. If the party who turns on the gas survives, he is guilty of murder; if on the other hand, the other person survives, that person's criminal liability is only that of an aider and abettor. "It would be discreditable if any actual legal consequences were made to hinge upon such distinctions." (Williams, *supra,* at p. 299; see also Barry, *supra,* 5 Melb. U.L.Rev. at p. 5.)

In light of the foregoing analysis we decline to ritualistically apply the active/passive distinction of *Matlock* to the genuine suicide pact situation in which the suicides are undertaken simultaneously by a single instrumentality. Given the inapplicability of *Matlock,* the actions of the minor constitute no more than a violation of Penal Code section 401.

The order declaring the minor a ward of the court is reversed and the cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

Bird, C. J., Richardson, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.