[Crim. No. 22878. Dec. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD LEE DEERE, Defendant and Appellant.

**COUNSEL**

Dennis L. Woodman, under appointment by the Supreme Court, and Woodman & Woodman for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom, John W. Carney and Frederick R. Millar, Jr., for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant Ronald Lee Deere appeals from a judgment imposing the death penalty following his conviction of one count of first degree murder and two counts of second degree murder, accompanied by a finding of a multiple-murder special circumstance (Pen. Code, § 190.2, subd. (a)(3)).[1] We conclude that the convictions and special circumstance finding should be affirmed, but the judgment must be reversed as to penalty.

---

[1]All further statutory references are to the Penal Code.

Defendant initially pleaded not guilty but later moved to withdraw his plea. The trial court appointed a psychiatrist to examine him; following such an examination and a report confirming defendant's competence, the court found defendant competent to plead guilty, to waive jury trial, and to co-operate with counsel in the event his plea was withdrawn. Accordingly, the court permitted defendant to withdraw his plea of not guilty, to waive his rights, and to plead guilty to each count and admit the special circumstance allegation. His counsel concurred in the change of plea. Based on the transcript of the preliminary hearing, the court then found defendant guilty of one count of first degree murder and two counts of second degree murder; based on defendant's earlier admission, the court also found true the multiple-murder special circumstance allegation.

Thereafter, defendant and his counsel also waived jury trial on the penalty issue. Pursuant to stipulation, the court considered the testimony at the preliminary hearing and at an earlier hearing to suppress evidence. Defendant offered no mitigating evidence, although he made a brief statement voicing remorse for his crimes and saying he deserved to die. Defense counsel explained at length to the court why he permitted his client to waive a jury trial at the guilt phase, to plead guilty, and to waive a penalty jury. The court sentenced defendant to death, and denied his motion to modify the penalty. (§ 190.4, subd. (e).) The appeal is automatic. (§ 1239, subd. (b).)

Because defendant does not deny responsibility for the three killings, there is no need to elaborate on the evidence linking him to those crimes. It is sufficient to state that defendant, evidently despondent about the termination of his relationship with Cindy Gleason, shot and killed the husband and two young children of Cindy's sister, Kathy Davis. Defendant had previously threatened to kill "everyone" in Cindy's family if she broke up with defendant. Shortly before the killings, Cindy received a telephone call from defendant telling her that "I'm not going to be responsible for what I do today." Later that night, Cindy discovered the bodies of Don, Michelle and Melissa Davis in Don's trailer. Defendant fled and hid from the police; he was arrested several days later.

## I. *Failure to Hold a Competence Hearing*

Defendant first contends the court erred in failing to hold a hearing to determine his competence to plead guilty and to waive a penalty jury. (§§ 1367-1368.) Section 1368 provides that if "a doubt arises in the mind of the judge as to the mental competence of the defendant," the court should inquire of defense counsel regarding his client's competence and, if counsel believes the defendant may be incompetent, the court should order a hearing on the matter. Under section 1368, even if defense counsel believes his

client is competent, the court may in its discretion order such a competence hearing. Despite the seemingly discretionary nature of the language of section 1368, we have held that a competence hearing is mandatory when "substantial" evidence of the accused's incompetence has been introduced. (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 91-92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; *People* v. *Pennington* (1967) 66 Cal.2d 508, 518-519 [58 Cal.Rptr. 374, 426 P.2d 942].)

Defendant asserts there were sufficient indications of his mental and emotional instability to trigger the court's obligation to order a competence hearing sua sponte. He emphasizes evidence disclosing that (1) shortly before the murders defendant had asked Kathy Davis, Cindy's sister, to kill him; (2) on prior occasions he had exhibited suicidal tendencies, including cutting himself with a razor blade; and (3) he was frequently intoxicated.

The record shows that before accepting the guilty plea the court ordered that defendant be examined by a board-certified psychiatrist, Dr. Bolger, who reported that defendant was mentally competent to plead guilty. Dr. Bolger described defendant as "cooperative," "stable" in mood, not depressed, possessing "high normal" I.Q., and "excellent" judgment as disclosed by verbal testing. According to Dr. Bolger, defendant displayed no evidence of psychosis, abnormal thinking or mental illness; he was "well aware of the charges facing him," was "well advised" of the significance of his waiver of a jury trial, and was able adequately to assist and cooperate with his counsel in his defense. Finally, Dr. Bolger noted that defendant fully appreciated the possibility, even the likelihood, that a death sentence might be imposed for his crimes.

■ Evidence that merely raises a suspicion that the defendant lacks present sanity or competence but does not disclose a present inability because of mental illness to participate rationally in the trial is not deemed "substantial" evidence requiring a competence hearing. (*People* v. *Laudermilk* (1967) 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228]; *People* v. *Stiltner* (1982) 132 Cal.App.3d 216, 222 [182 Cal.Rptr. 790]; *People* v. *Humphrey* (1975) 45 Cal.App.3d 32, 37 [119 Cal.Rptr. 74].) As we stated in *Laudermilk,* "more is required to raise a doubt [of competence] than mere bizarre actions [citation] or bizarre statements [citation] . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]." (67 Cal.2d at p. 285.)

■ The evidence in the present case falls far short of that which would require a competence hearing on the court's own motion. Certainly, neither the court nor defense counsel expressed any "doubt" regarding defendant's

competence. The court carefully explained that although it had appointed Dr. Bolger "to be certain" of defendant's ability to stand trial and cooperate with counsel (cf. *People* v. *Teron* (1979) 23 Cal.3d 103, 114 [151 Cal.Rptr. 633, 588 P.2d 773], approving this practice), there was no evidence or any "possible grounds" for convening a formal competence hearing. Defense counsel agreed that "I have seen no evidence in Mr. Deere that would suggest that he's in any way incompetent."

Appellate counsel now suggests that defendant's very acts of pleading guilty to a capital offense and waiving a jury trial amounted to a "suicide attempt" which disclosed his incompetence. The record does indicate that defendant felt great remorse for his offenses and was prepared to suffer the consequences of a judgment of death. But that attitude does not necessarily demonstrate an incompetence to stand trial or to plead guilty. His plea and waiver were concurred in by counsel. ■ As stated in *Teron,* at the guilt phase a defendant bears no duty to present a defense or to rebut the People's case, and the fact that he declines to present a defense does not demonstrate a lack of capacity to waive his rights. (23 Cal.3d at p. 115.)

■ Likewise, defendant's waiver of a penalty jury did not constitute "substantial" evidence of incompetence. The record shows that his waiver of such a jury was induced, at least in part, by his wish to bring the proceedings to a conclusion without the undue delay and expense occasioned by a jury trial. As defense counsel informed the court, defendant "knows what would happen if the case went to jury trial, and he feels that the expense of a circus or charade of a trial is not right for him or for the community." It is a matter of common knowledge that the process of "death qualifying" a jury in a capital case may consume a substantial amount of time and effort. It was not irrational for defendant to assert that he preferred not to waste his time listening to trial counsel "yak" about which prospective jurors were opposed to the death penalty and which were not.

We conclude that the court did not err in failing to order a competence hearing sua sponte.

## II. *Waiver of Penalty Phase Jury*

■ Section 190.4, subdivision (e), provides for an automatic review of the penalty verdict by the judge. Defendant complains that he was never told his waiver of a penalty jury would necessarily preclude an independent reevaluation of the verdict by the judge. The point is frivolous; defendant is deemed to have known that by waiving a jury trial he would lose his statutory right to a penalty decision by both the jury and the judge. When the judge renders a decision on penalty, and thereafter carefully reviews

that decision on motion for modification pursuant to section 190.4, the defendant is afforded ample due process.

Defendant relies on *People* v. *Granger* (1980) 105 Cal.App.3d 422 [164 Cal.Rptr. 363], but the case is inapposite. *Granger* held that the defendant's waiver of a jury trial in a murder case did not extend to the special circumstances phase of the case, because the trial court failed to adequately explain to the defendant the availability of a trial on that issue. In the present case, defendant pleaded guilty to the offenses charged and admitted the special circumstance allegation. Thus, unlike *Granger,* his jury waiver was necessarily confined to the penalty phase.

■ Article I, section 16, of the Constitution requires the concurrence of counsel in a criminal defendant's waiver of jury trial. Although counsel did concur here, defendant now asserts that counsel's assent demonstrated his incompetence. As defendant states the argument, "Defense counsel should have refused to do anything to aid appellant to carry out his death wish."

The record, however, fails to demonstrate on its face that counsel's consent to waive a jury was not motivated by sound tactical considerations. In light of the heinous nature of defendant's crimes, counsel may reasonably have believed that an experienced trial judge would be more capable than a jury of viewing the facts dispassionately and possibly exercising mercy on defendant's behalf. On this record, the decision to waive a penalty jury cannot be said to constitute a failure to act "in a manner to be expected of reasonably competent attorneys acting as diligent advocates." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

There is no indication that counsel's decision to forego a penalty jury—unlike his failure to present mitigating evidence, discussed below—was motivated *solely* by a willingness to facilitate defendant's "death wish." We conclude that counsel was not shown to be incompetent in consenting to the waiver of a penalty jury.[2]

### III. *Failure to Offer Mitigating Evidence*

■ Defendant next contends the sentence of death must be set aside because his counsel failed to offer any mitigating evidence during the pen-

---

[2]While it might have been preferable for the judge to have declined to accept the waiver and to have impanelled a jury, as occurred in *People* v. *Stanworth* (1969) 71 Cal.2d 820, 829 [80 Cal.Rptr. 49, 457 P.2d 889], we cannot fault this exercise of his discretion. The judge made every reasonable effort to ascertain defendant's competence to waive; a reviewing court should not second-guess that factual determination.

alty phase apart from defendant's own statement and testimony at the preliminary examination and a suppression hearing. Counsel first permitted his client to make a brief statement to the court acknowledging that "I know what I done was wrong" and "I always believed [in] an eye for an eye. I feel I should die for the crimes I done." Counsel then explained at length the reasons that induced him to agree to the guilty plea, the jury waiver, and the failure to offer mitigating evidence. According to counsel, he argued with defendant about each of these decisions but finally grew to appreciate and concur with his client's point of view.

Counsel recognized at the outset that "it probably is unprecedented, at least in California, that a defense lawyer has permitted a defendant in a capital case to do what Mr. Deere has done." Counsel then took the "legal position" that the record does *not* support a finding that aggravating circumstances outweigh mitigating circumstances, and hence that the penalty should not be death. He also expressly conceded that "It's not as if there is no mitigating evidence to offer. Ronnie knows that members of his family . . . wanted him to fight; they wanted to come in and testify and tell the Court that there are good things about Ronnie Deere; there is a reason to let him live."

Nevertheless counsel stated that he did not offer mitigating evidence because defendant "knows that he does not deserve mercy" and had convinced counsel that to call such witnesses would "cheapen" his relationship with his family and remove "the last vestige of dignity he has." Counsel made it clear that the decision to resist—indeed, to invite—a death sentence was not his own but defendant's: "What can he say to the family, or what's left of the family of his victims? . . . Well, there's nothing he can say, and he knows that. The only thing he can do is say, 'I accept full responsibility for what I did. I demand just punishment,' and just punishment is a penalty of death, to him. . . . [¶] I know that this case will be reviewed in scrutiny by appellate lawyers and by appellate courts. As to what decisions may be made at some future time I'm certainly not in a position to comment on. But each decision I made has been in close consultation with Ronnie. *It has been based on his desires and my conclusion that I have no right whatsoever to infringe upon his decisions about his own life.*" (Italics added.)

As Justice Rutledge wrote, "To state the question often is to decide it. And it may do this by failure to reveal fully what is at stake." (*Yakus* v. *United States* (1943) 321 U.S. 414, 482 [88 L.Ed. 834, 879, 64 S.Ct. 660] (dis. opn.).) The dilemma in the present case is that the question may be put in one of two ways, each deciding the issue differently.

If the question is whether this defendant may elect to sacrifice his life to atone for the murders he committed, the answer is affirmative. While at

common law suicide was a felony punishable by forfeiture of property to the king and ignominious burial, there is nothing in modern law to prevent a person from resolving or attempting to end his life. (*In re Joseph G.* (1983) 34 Cal.3d 429, 433 [194 Cal.Rptr. 163, 667 P.2d 1176].) Indeed, there is a body of law evolving that appears to respect a person's choice of how and when to die. (See, e.g., Health & Saf. Code, §§ 7185-7195 [the Natural Death Act].)

However, if the question is whether a person may compel the people of the State of California to use their resources to take his life, the answer must be negative. This is so for several reasons. First, to hold otherwise would make superfluous the constitutional requirement that every capital case be reviewed by the Supreme Court and that no judgment of death be executed unless it has been affirmed by this court. (Cal. Const., art. VI, § 11.)

In this respect the case at bar is remarkably similar to *People* v. *Stanworth, supra,* 71 Cal.2d 820. That defendant not only sought to waive a jury trial on penalty, he attempted to dismiss his counsel so that no evidence would be presented on his behalf. Much like Deere, Stanworth told the trial judge: "I pleaded guilty; I confessed. I'll even give you my life. I'll sign my own death warrant. . . . [¶] I would like to plead no contest and have no witnesses whatsoever on my behalf. . . . I don't want nothing in my behalf." (*Id.* at p. 829, fn. 11.) After conviction, Stanworth sought to "waive" or dismiss his automatic appeal, or at least to have it decided by a perfunctory affirmance. (*Id.* at p. 830, fn. 12.) He wrote to this court that "I and I alone must suffer for my acts and I understand also that the law holds me to task for my actions. . . . [P]lease be merciful and give me an endless sleep as soon as you can . . . I want no re-trial, no penalty trial or any favorable action from this Court[;] all I want, is to die." (*Ibid.,* fn. 13.)

We rejected Stanworth's attempt to dismiss his appeal, reiterating the longstanding rule that the statute providing for automatic appeals from judgments of death (§ 1239, subd. (b)) imposes a duty on this court in such cases to examine the complete record in order to determine whether the defendant has had a fair trial. As Justice Sullivan wrote for the court (*id.* at p. 833), "It is manifest that the state in its solicitude for a defendant under sentence of death has not only invoked on his behalf a right to review the conviction by means of an automatic appeal but has also imposed a duty upon this court to make such review. We cannot avoid or abdicate this duty merely because defendant desires to waive the right provided for him."

*Stanworth* cited *People* v. *Werwee* (1952) 112 Cal.App.2d 494, 500 [246 P.2d 704], for the proposition that "'Although a defendant may waive

rights which exist for his own benefit, he may not waive those which belong also to the public generally.'" (*People* v. *Stanworth, supra,* 71 Cal.2d at p. 834.) It further quoted (*ibid.*) from *People* v. *Blakeman* (1959) 170 Cal.App.2d 596, 598 [339 P.2d 202], the view that "'The fallacy of this argument is that we are not dealing with a right or privilege conferred by law upon the litigant for his sole personal benefit. We are concerned with a principle of fundamental public policy. The law cannot suffer the state's interest and concern in the observance and enforcement of this policy to be thwarted through the guise of waiver of a personal right by an individual. "Any one may waive the advantage of a law intended [solely] for his benefit. But a law established for a public reason cannot be contravened by a private agreement." (Civ. Code, § 3513.)'"

To permit a defendant convicted of a potentially capital crime to bar his counsel from introducing mitigating evidence at the penalty phase because he wants to die, as did this defendant, would likewise violate the fundamental public policy against misusing the judicial system to commit a state-aided suicide. It would also prevent this court from discharging its constitutional and statutory duty to review a judgment of death upon the complete record of the case, because a significant portion of the evidence of the appropriateness of the penalty would be missing.

This deficiency of the record implicates another paramount concern of the state: "in capital cases . . . the state has a strong interest in reducing the risk of mistaken judgments." (*People* v. *Chadd* (1981) 28 Cal.3d 739, 751 [170 Cal.Rptr. 798, 621 P.2d 837].) In *Chadd* we upheld the validity of a statute that bars acceptance of a guilty plea to a capital charge without the consent of defense counsel. (§ 1018.) We observed that the statute was enacted as part of the Legislature's response to *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], and its companion cases, which condemned arbitrariness in the operation of death penalty laws: this history, we said, demonstrated that the Legislature intended the statute "to serve as a further independent safeguard against erroneous imposition of a death sentence." (28 Cal.3d at p. 750.) Since 1976 the United States Supreme Court has repeatedly recognized that the qualitative difference between death and all other penalties demands a correspondingly higher degree of reliability in the determination that death is the appropriate punishment. (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (plur. opn.).) And since 1978 the high court has insisted that the sentencer must be permitted to consider any aspect of the defendant's character and record as an independently mitigating factor. (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604-605 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954] (plur. opn. of Burger, C. J.).)

To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling. In either case the state's interest in a reliable penalty determination is defeated.[3]

■■ Finally, the defense attorney's honest but mistaken belief that he had "no right whatsoever to infringe upon his [client's] decisions about his own life" operated to deny defendant his right to the effective assistance of counsel. While counsel should of course endeavor to comply with his client's wishes to the maximum extent consistent with his legal and ethical responsibilities, he is not—contrary to popular misconception—a mere "mouthpiece." As we recently found it necessary to reiterate, "Once an attorney is appointed to represent a client, he assumes the authority and duty to control the proceedings. *The scope of this authority extends to matters such as deciding what witnesses to call,* whether and how to conduct cross-examination, what jurors to accept or reject, what motions to make, and most other strategic and tactical determinations." (*People v. McKenzie* (1983) 34 Cal.3d 616, 631 [194 Cal.Rptr. 462, 668 P.2d 769], italics added.)

The rule clearly applies to the issue before us. In *People v. Frierson* (1979) 25 Cal.3d 142, 164-167 [158 Cal.Rptr. 281, 599 P.2d 587], we held that when mitigating testimony can be produced with due diligence, failure to call witnesses to give such evidence in the penalty phase of a capital trial deprives the defendant of effective assistance of counsel. A thorough review of this question concludes that at the penalty phase defense counsel has a critical obligation to present a case in mitigation, first, "to assure reliability in capital sentencing," and second, "to attempt to persuade the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die." (Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases* (1983) 58 N.Y.U. L.Rev. 299, 317-318 [hereafter Goodpaster, *The Trial for Life*].) "Where potentially beneficial mitigating evidence exists and counsel has not presented it, counsel has precluded the

---

[3]Defendant does not contend—and we do not hold—that this interest compels the introduction in capital cases of every conceivable item of arguably mitigating evidence. As defendant explains, "Ordinarily that interest can be amply protected by reliance upon competent counsel to sift through the available evidence and present that which in counsel's judgment makes the most compelling case in mitigation." An appellate court will not second-guess the judgment of competent counsel. (See, e.g., *People v. Jackson* (1980) 28 Cal.3d 264, 294-296 [168 Cal.Rptr. 603, 618 P.2d 149].) In the case at bar, however, the mitigating evidence was excluded not because of an attorney's tactical decision that other evidence would be more likely to avoid a death penalty but because a defendant seeking that penalty barred his counsel from offering any mitigating evidence at all.

sentencer from considering mitigating factors. Through failure to discover or present such evidence, counsel has 'create[d] the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.'" (*Id.* at p. 319, quoting from *Lockett* v. *Ohio, supra,* 438 U.S. at p. 605 [57 L.Ed.2d at p. 990].)

Since *Frierson* it has also been plain that the available mitigating evidence need not appear conclusive or even particularly persuasive. As the plurality opinion explained, in that case a habeas corpus petition filed with the appeal offered "several declarations from relatives, friends and acquaintances of defendant containing material which *conceivably* might have mitigated his conduct. For example, defendant's mother reviewed certain explanatory circumstances surrounding his youth and family difficulties, and an adult friend declared that he had never seen defendant exhibit any signs of violence or hostility. Although these declarations are of doubtful legal significance, they do demonstrate the *possibility* that at least someone might have been called to testify on defendant's behalf and to urge that his life be spared." (25 Cal.3d at p. 165, italics added and deleted.) The opinion then stressed the explicit references in the death penalty law to the introduction and consideration of mitigating evidence (§ 190.3), and concluded that "it seems highly unlikely that trial counsel by the exercise of reasonable diligence, would have been unable to locate a single witness willing to present *some* mitigating testimony invited by this section." (*Ibid.,* italics added.)

Recent federal cases likewise hold that a defense attorney's failure to present any mitigating evidence in the penalty phase of a capital trial deprives the defendant of effective assistance of counsel. (E.g., *Blake* v. *Kemp* (11th Cir. 1985) 758 F.2d 523, 533-535; *Dillon* v. *Duckworth* (7th Cir. 1984) 751 F.2d 895, 901; *Pickens* v. *Lockhart* (8th Cir. 1983) 714 F.2d 1455, 1465-1468.) *Blake* is particularly apposite. There, as here, defense counsel deliberately refrained from preparing and presenting mitigating evidence because of an honest but mistaken belief: he was convinced that Blake would be found not guilty by reason of insanity. The ensuing judgment of death was vacated on federal habeas corpus. At the hearing Blake offered four witnesses, in addition to his mother, who could have spoken on his behalf: "All could have testified to the effect that Blake was a man who was respectful toward others, who generally got along well with people and who gladly offered to help whenever anyone needed something." (758 F.2d at p. 534.)

The federal circuit court affirmed the grant of habeas corpus. Senior Judge Tuttle, writing for the court, reasoned that "Certainly [Blake] would have been unconstitutionally prejudiced if the court had not permitted him to put on mitigating evidence at the penalty phase, no matter how overwhelming

the state's showing of aggravating circumstances. *See Lockett* v. *Ohio,* 438 U.S. 586, 604 . . . . Here, [counsel's] failure to seek out and prepare any witnesses to testify as to mitigating circumstances just as effectively deprived him of such an opportunity. This was not simply the result of a tactical decision not to utilize mitigation witnesses once counsel was aware of the overall character of their testimony. Instead, it was the result of a complete failure—albeit prompted by a good faith expectation of a favorable verdict—to prepare for perhaps the most critical stage of the proceedings. We thus believe that the probability that Blake would have received a lesser sentence but for his counsel's error is sufficient to undermine our confidence in the outcome." (*Id.* at p. 535.)[4]

There is no mystery as to the kind of evidence defense counsel should prepare and present at the penalty phase. As Professor Goodpaster explains, "First, counsel must portray the defendant as a human being with positive qualities. The prosecution will have selectively presented the judge or jury with evidence of defendant's criminal side, portraying him as evil and inhuman, perhaps monstrous. Defense counsel must make use of the fact that few people are thoroughly and one-sidedly evil. Every individual possesses some good qualities and has performed some kind deeds. Defense counsel must, therefore, by presenting positive evidence of the defendant's character and acts, attempt to convince the sentencer that the defendant has redeeming qualities. A true advocate cannot permit a capital case to go to the sentencer on the prosecution's one-sided portrayal alone and claim to be rendering effective assistance.

"As the second element of the mitigating case, the defense must attempt to show that the defendant's capital crimes are humanly understandable in light of his past history and the unique circumstances affecting his formative development, that he is not solely responsible for what he is. Many child abusers, for example, were abused as children. The knowledge that a particular abuser suffered abuse as a child does not, of course, excuse the conduct, yet it makes the crime, inconceivable to many people, more understandable and evokes at least partial forgiveness. Counsel's demonstration that upbringing and other formative influences may have distorted the defendant's personality or led to his criminal behavior may spark in the sentencer the perspective or compassion conducive to mercy. Thus, effective assistance of counsel in such circumstances entails at a minimum the attempt to gather and present at least some evidence of the defendant's background which might serve to explain the defendant's crimes and elicit

---

[4]This is the standard, of course, recently adopted by the United States Supreme Court for judging prejudice caused by a denial of effective assistance of counsel under the Sixth Amendment. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-695 [80 L.Ed.2d 674, 693-698, 104 S.Ct. 2052, 2064-2068].)

a compassionate response from the sentencer." (Goodpaster, *The Trial for Life, supra,* pp. 335-336, fns. omitted.)

In the case at bar the trial took place more than three years after our decision in *Frierson.* Because counsel made no offer of proof, we do not know the precise nature of the mitigating evidence he could have presented. But the record nevertheless demonstrates "the possibility that at least *someone* might have been called to testify on defendant's behalf and to urge that his life be spared." (25 Cal.3d at p. 165, italics in original.) Even before the penalty phase began, the court remarked to defendant: "you do understand you can put on evidence as to mitigating circumstances. That would mean evidence as to the good things in life you've done, and I understand that you've done a lot of good things. I understand that you're a poet, and I'm certainly aware of the fact that you're a clear thinker, and I'm sure that you've had a lot of experience in your life that was admirable." As quoted above, in his lengthy statement to the court in lieu of mitigating evidence counsel conceded that members of defendant's family wanted to testify in his behalf "and tell the Court that there are good things about Ronnie Deere; there is a reason to let him live." Such witnesses could have related any redeeming qualities defendant might have and any events in his life that reveal those qualities. Indeed, in addition to family members there are often others whose lives or activities have been favorably touched by the person on trial: coworkers, employers, teachers, neighbors, or friends. Although the testimony of each might seem trivial in isolation, counsel cannot be certain that the cumulative effect of their message would not tip the scale in his client's favor in the difficult matter of determining the appropriate penalty. Yet here counsel made no effort to call any such witnesses on defendant's behalf.[5]

---

[5]The concurring opinion misunderstands the full responsibilities of counsel. True, he has a duty to represent the views of defendant, however bizarre. But he is also an officer of the court (*Hickman* v. *Taylor* (1947) 329 U.S. 495, 510 [91 L.Ed. 451, 462, 67 S.Ct. 385]) with a duty to assure that the court has all relevant information to be able to perform its mandatory consideration of mitigating circumstances.

To propose that "the court might permit the defendant himself to address the jury" would be unprecedented when he has counsel. The additional suggestion that "the court could call persons with mitigating evidence as its own witnesses" implies that the court can determine who and where those witnesses are without the help of defendant and his counsel.

The suggestion that additional counsel might be appointed by the court is impractical. Defendant may be entitled to two attorneys in a capital case (*Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]). Entry of a third attorney in the concluding phases of a lengthy trial would require a substantial delay in order to enable him to familiarize himself with the entire case, ascertain what witnesses might be available, determine what their testimony would be, and then subpoena them to appear. In addition the third attorney would require an award of attorney's fees and funds for an adequate investigation. Capital cases are sufficiently complicated now and take long enough, without injection of new personnel and unnecessary additional delay. The more rational solution is to impose the duty to present mitigating factors on counsel who are already familiar with the case and all its implications.

The lack of testimony on this issue clearly impressed the trial court. In weighing the aggravating and mitigating circumstances preparatory to fixing the penalty, the court observed: "In mitigation, you elected to present very little. In small pieces, I came to the conclusion that you are a poet, a writer and have expressed your ability to love in the past. *But that certainly wasn't demonstrated here.*" (Italics added.) The question is, why was it not "demonstrated here"? For the reasons given above, counsel should have exploited whatever talents his client possessed in the hope that they might reveal, as a mitigating circumstance, defendant's potential to ultimately make a constructive contribution to society. We need not be reminded of the literary figures who made their mark on history despite periods of penal confinement.

When the sentencer in a capital case is deprived of all or a substantial part of the available evidence in mitigation, "the potential for prejudice is too obvious to require proof." (Goodpaster, *The Trial for Life, supra,* p. 350.) Indeed, "short of substituting a verdict of its own, there is no way for a reviewing court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision." (*Id.* at p. 354.) We have no doubt that a judgment of death imposed in such circumstances constitutes a miscarriage of justice (Cal.Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all.

The judgment is reversed as to penalty and affirmed in all other respects.

Bird, C. J., Reynoso, J., and Kaus, J.,* concurred.

**BROUSSARD, J.**—I join with the majority in reversing the judgment as to penalty, but I write separately to state my reasons for doing so.

The State of California asserts an interest, independent from that of the defendant, in the accuracy of the penalty determination at a capital trial. (See *People* v. *Stanworth* (1969) 71 Cal.2d 820, 830-834 [80 Cal.Rptr. 49, 457 P.2d 889].) Both the 1977 death penalty law and the 1978 initiative plainly envision that this interest will be protected by an adversary proceeding in which the prosecuting attorney will present the aggravating evidence and defense counsel will present the mitigating evidence. In the present case mitigating evidence was available. Members of defendant's family were present in court and willing to testify on defendant's behalf. Defense counsel, however, acceding to the request of his client, presented no mitigating

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

evidence. A penalty trial at which all mitigating evidence is withheld is inadequate to safeguard the state's interest in the reliability of penalty decisions; as the majority point out, it is equivalent to "no penalty trial at all." (Majority opn. at p. 368.)

I hesitate, however, to describe this case as one involving "the ineffective assistance of counsel." The constitutional right to the effective assistance of counsel belongs to defendant personally. A man facing the awful alternatives of execution or life imprisonment without possibility of parole could rationally prefer execution, or at least feel that the comparative advantage of life imprisonment was not worth the humiliation and loss of dignity he believes entailed in the presentation of mitigating evidence. Here counsel satisfied himself that his client was making a rational, knowing, and intelligent decision, and then acted in accord with his client's wishes. I do not believe his conduct violated any constitutional right of defendant.

Although counsel in this case fulfilled his obligations to his client, he failed to perform a role assigned to him by the state, that of presenting the mitigating evidence necessary to assure the reliability of the penalty determination. But the fact that the state assigns defense counsel a role which may require him to act contrary to his client's wishes on a matter of such vital importance to the client presents a troubling picture. The defense of a capital case often requires a close and trusting relationship between counsel and client; yet our decision requires counsel to violate that trust, to take a position against his client, and perhaps to present evidence revealed to him in confidence by his client.

Trial courts should explore methods of alleviating this conflict. In some cases it might be desirable for counsel, in addition to presenting mitigating evidence, to inform the jury of defendant's personal position. In other cases, the court might permit the defendant himself to address the jury. Alternatively, the court could call persons with mitigating evidence as its own witnesses, or appoint new counsel to call them, and thereby place on the record the mitigating evidence essential to a careful, balanced penalty determination.

In sum, both the state's need to assure the fairness and reliability of the penalty determination, and defendant's rights to personal choice and dignity, command respect. It is essential that the penalty trial constitute a balanced presentation of aggravating and mitigating evidence, but this goal should be achieved, as far as possible, with respect and accommodation for defendant's personal values and for his relationship with counsel.

I therefore join in reversing the penalty judgment, not on the ground of incompetency of counsel, but because no steps were taken to assure a fair

and balanced penalty trial. I am confident that we would not reverse a penalty judgment after the trial court had taken independent steps to assure a fair and balanced penalty trial, even though the mitigating evidence was not presented by defense counsel.

Grodin, J., concurred.

**LUCAS, J.**—I concur in the judgment affirming defendant's conviction of first degree murder with special circumstances, and of second degree murder (two counts).

I respectfully dissent, however, to reversal of the penalty of death on the ground of trial counsel's incompetence in failing to offer mitigating evidence at the penalty phase. Although the majority fails to specify what evidence was available, apparently it faults counsel for failing to explore the "good things" in defendant's life. (*Ante,* p. 361.) In my view, counsel's prolonged consideration of the matter, resulting in his ultimate determination, expressed on the record, to respect his client's firm resolve to face his punishment without groveling for mercy, and without undergoing an awkward parade of defendant's friends and relatives at the penalty trial, cannot be deemed unreasonable or incompetent representation. The majority's contrary rule, requiring counsel to overrule his client and attempt to dredge up mitigating testimony despite the consequent loss of his client's dignity, and the probable serious invasion of his privacy, approaches an unconstitutional infringement of defendant's due process, privacy and self-representation rights.

The record reflects that defendant, experiencing considerable remorse for his heinous misdeeds, sought to expedite the trial without undue delay and embarrassment for himself and his family, not to mention the victims' own family. Trial counsel first permitted his client to make a brief statement to the court which acknowledged that what he did was "wrong" and that "I feel I should die for the crimes I done." Next, counsel explained at length the reasons which induced him to agree to entry of a guilty plea, to waive a jury trial, and to decline to offer any further mitigating evidence. According to counsel, he strongly argued with defendant regarding each of these decisions but finally grew to appreciate and concur with his client's point of view.

Counsel realized that some mitigating evidence could have been presented in the form of testimony from defendant's family regarding the "good things" in defendant's life. "But," as counsel noted, "Ronnie says that is his life, his past life, his personal life; and to him, it cheapens all of his relationships if he brings those [persons] in now to make a plea for mercy,

where, in his heart, he knows that he does not deserve mercy. [¶] It boils down to, I think, the simple question of just what is a man's dignity worth. Does a man in Ronnie Deere's position, having done what he did—does he have any human dignity left at all? And he has convinced me that had he fought for his life, got down on his belly and crawled, virtually, like a snake to plead for leniency and mercy, that would be losing the last vestige of dignity he has. [¶] What can he say to the family, or what's left of the family of his victims? He virtually wiped out a family, a father and two small children . . . . The only thing he can do is say, 'I accept full responsibility for what I did. I demand just punishment,' and just punishment is a penalty of death, to him . . . . [¶] I know that this case will be reviewed in scrutiny by appellate lawyers and by appellate courts. As to what decisions may be made at some future time I'm certainly not in a position to comment on. *But each decision I made has been in close consultation with Ronnie. It has been based on his desires and my conclusion that I have no right whatsoever to infringe upon his decisions about his own life . . . . [¶] And his decisions are not suicidal, crazy decisions. They are rational, intelligent decisions by a man who realizes what he has done and says, 'This is the only position I can take to show you that I am still a man and not an animal.'*" (Italics added.)

Defense counsel did not affirmatively advocate the death penalty for his client. Indeed, he argued to the court that the record supported only a penalty of life without possibility of parole because the aggravating circumstances failed to outweigh the mitigating ones. Thereafter, counsel moved the court to modify its penalty decision, arguing at length defendant's mental and emotional distress during the offenses and the relatively painless method of executing his victims.

I do not believe that trial counsel is incompetent in failing to parade the defendant's friends or relatives before the court or jury in an attempt to create sympathy for him. To hold that a competent defendant has no right to make such a choice could seriously infringe upon his personal rights of privacy and dignity. At the very least, the majority's holding is unacceptably patronizing, requiring counsel to override his client's reasoned and informed decision because defendant ultimately cannot be trusted to make sound choices about his own fate. In my view, such a holding comes close to violating the United States Supreme Court's admonition that "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself . . . ." (*Faretta* v. *California* (1975) 422 U.S. 806, 817 [45 L.Ed.2d 562, 572, 95 S.Ct. 2525].)

I believe that the state's interest in assuring the reliability of death judgments can be adequately served by assuring the accuracy of the guilt and

penalty determinations without, in effect, requiring an unwilling defendant and his acquaintances to plead for mercy. Moreover, the majority fails to consider the strong possibility that counsel's actions were indeed motivated by a sound tactical decision to present defendant as a person, replete with remorse and a sincere desire to atone for his terrible crimes. Counsel may well have believed that by presenting defendant in that light, the sentencing court would be more inclined to exercise mercy than if defendant and his family openly begged for it.

I also observe that defendant has not filed a habeas corpus petition specifying precisely what mitigating evidence was available to trial counsel, as required by us in *People* v. *Jackson* (1980) 28 Cal.3d 264, 293-296 [168 Cal.Rptr. 603, 618 P.2d 149]. How can we find counsel incompetent for failing to introduce mitigating evidence in the absence of any proof that such evidence was available? Does the majority intend to overrule *Jackson* sub silentio?

I would affirm the judgment in its entirety.

Respondent's petition for a rehearing was denied February 14, 1986. Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.