Filed 4/22/16  P. v. Leyva CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B261648 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA395133) |
| v. | |
| FREDDY LEYVA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Craig J. Mitchell, Judge.  Affirmed.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Nathan Guttman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Freddy Leyva appeals from the judgment entered following a jury trial that resulted in his conviction of first degree murder while using a deadly weapon (knife) (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1)).[1] He was sentenced to prison for 25 years to life, plus a consecutive one-year term for the use enhancement.

Defendant contends the trial court committed prejudicial error in failing to conduct a competency hearing (§ 1368, subd. (b)) before allowing him to testify, because he was unable to assist counsel in a rational manner in presenting his defense. He also contends the court's erroneous exclusion of his prior testimony from his first trial[2] as substantive evidence of his mental state during his stabbing of the victim violated his constitutional rights to present a defense and to due process of law.

We affirm the judgment. A second competency hearing was unwarranted. Substantial evidence supports the trial court's finding that no doubt existed that defendant was mentally competent to testify at the time he elected to do so. Exclusion of defendant's prior testimony as substantive evidence of his mental state was not an abuse of discretion.

BACKGROUND

On March 14, 2012, about 4:40 p.m., defendant stabbed to death Dwayne Alexander in the third floor office of the program advisors for the Los Angeles Job Corps (LAJC) in Hollywood. Alexander, who had 29 stabbing or cutting wounds, including some probably inflicted from behind, died as the result of five of these wounds.

LAJC provided job training services to adult students to earn vocational degrees for various professions. At the time, Alexander, Nicholas Smith, and Man Sing Yip were the program advisors who were responsible for counseling defendant regarding employment, education, and day-to-day life. Defendant resided in the third floor dormitory for male students.

---

[1]     All further section references are to the Penal Code unless otherwise indicated.

[2]     On October 25, 2013, a mistrial was declared because the jury was deadlocked as to a verdict of murder (10) or manslaughter (2).

2

About 3:00 p.m. that day, when defendant entered the third floor office, Alexander, Smith, and Yip were working at their computers. Alexander and Smith greeted him, and Alexander asked how his day was going. Defendant nodded his head, his usual response.

About 4:40 p.m., defendant returned with a stack of bed sheets. Alexander was sitting at his desk, facing the door, and working on his computer. Yip was sitting at his desk, and Smith was standing between two of the desks.

After dumping the sheets, defendant rushed around the desk and began stabbing Alexander with a downward motion. He first stabbed the right side of his back. Alexander stood and attempted to defend himself, to no avail. Smith yelled for him to stop. Defendant hesitated, looked at Smith, and resumed stabbing Alexander. Smith did not hear defendant say anything. Smith and Yip left to find help.

Through the open door, Clevaughn Wynter, a resident, saw defendant stab Alexander multiple times, mainly in his upper body, as Alexander attempted to kick him away. Wynter tried to grab the knife, but defendant pulled the knife from Alexander's body, where it was stuck, and held it pointing down at Wynter, who pushed him against the wall and asked what he was doing. Defendant did not respond and struggled to free himself. Alexander collapsed face-first on the floor.

Two other residents arrived at the scene. Walter Herrera saw defendant facedown on the office floor as Wynter struggled to hold down his right hand, which held a knife. Defendant tried to stab Wynter and kick Alexander. Brian Tack saw Wynter and Herrera grasping defendant's hand while telling him to let go of the knife. Defendant protested when Tack began choking him. He said nothing when Tack responded he knew he was choking him "but [said] I need you to let go of the knife." Wynter and Herrera pried the knife from his hand.

Tack loosened his grip after defendant ceased struggling and his face turned purple. His face "looked like he had a moment of shock at what he had done, and then it quickly turned to anger," and he began kicking Alexander. In other words, his face looked like "he couldn't believe what he had done for a moment," rather than "he didn't

3

know what had just happened." After Tack dragged defendant farther into the hallway, he struggled to return to the office.

Los Angeles Police Officer Robert Davenport observed defendant, who was being escorted away after his arrest, look over to Smith and say, "Fuck him. He had it coming." Officer Nicholas Zehner noted that defendant appeared "enraged." During prebooking at the police station, when asked for his Social Security number, defendant smiled and said, "This blood [, i.e., the blood on his fingers, clothing, and shoes,] makes me fucking horny. I'm a man now."

About three and a half weeks before Alexander's murder, defendant became a roommate of Javier Rocha. Rocha thought from the beginning that defendant was "creepy," and his behavior became angrier during the time leading up to the murder. Defendant would express his anger and animosity toward "[e]vil people, Black people, and homosexuals." Once, he asked, "What am I supposed to do with those people," meaning "Black people," to which Rocha responded, "he shouldn't be hating anybody and [told him] just to relax, maybe take a walk or something, get some air." Another time, defendant angrily told Rocha that he thought Alexander and a LAJC teacher were homosexual. Rocha disputed this assertion and told him to relax.

On one occasion, Rocha saw defendant standing outside the shower stalls wearing only a towel covering his penis, which was very unusual, because the male residents typically wore towels around their waists while waiting to use the shower stalls. Other residents, apparently disturbed, left the shower area. As defendant headed into the hallway, Alexander approached and asked what he was doing. Defendant responded that he was waiting for the shower. Alexander told him to respect the other students and put the towel around his waist. The day before the murder, defendant told Rocha that he lost his dignity; he needed to do something to get it back; and people were naked in the Bible. He said he did nothing wrong and would fight Alexander.

In March 2012, resident Gilberto Quiroa, who was friendly with defendant's sister but was not her boyfriend, met defendant after transferring to his dormitory and

4

attempted to befriend him. On March 11, 2012, defendant warned Quiroa, "[D]on't fuck with me or my sister."

On March 12, 2012, two days before Alexander's murder, defendant told Quiroa that he had "fucked" his mother the previous night, to which insult Quiroa responded falsely that his mother had AIDS and so must defendant. Later, during a game of pool, the two argued about "house rules" regarding placement of the cue ball. When Quiroa was retrieving a broom to clean the program advisors' office, defendant waved his hand, made screaming noises to scare him, and walked away when Quiroa did not react. He returned and pushed Quiroa's lower back with his foot. About 10:00 p.m., he approached Quiroa and mimicked stabbing a knife into his left palm.

At trial, defendant testified that in 2012, he was studying at LAJC to be an electrician. With respect to his interactions with Alexander, defendant testified he did not earn his respect and that once or twice a week, during the lunch period at the lunch room, Alexander made defendant uncomfortable by staring at him without saying anything or making any gesture toward him. He admitted he never talked to Alexander about this. On a Saturday, defendant was behind an opaque shower curtain with the water running in the shower near Alexander's office when the latter entered and asked who was there. After defendant identified himself, Alexander pulled open the curtain and grabbed his "balls." Defendant said he was not gay and told him to "back off." Alexander left, but defendant felt "a little bit kind of gay, homosexual" and "disgusted." Defendant cried because he was reminded of the time he was sexually molested in the third grade.

On a subsequent occasion, upon returning from school, defendant discovered Alexander "enjoying" his bed. Standing up, Alexander told defendant he was not supposed to be back so early and that he would "write a report." After he left, defendant noticed his underwear in the drawer had been moved.

The day before the murder, defendant entered Alexander's office to sign in after returning from school. He complied with Alexander's directive to close the door. The small window in the door was covered with paper, which was unusual. Alexander then hugged him from behind and although defendant struggled to get away, Alexander kissed

5

his neck.  Defendant, disgusted, told him to stop.  Alexander let defendant go after he was "pleased enough."  This incident made defendant feel like he had "a hole" in his stomach and he could not sleep at night.  He was scared because Alexander was "in control."

At trial, defendant acknowledged that March 14, 2012, was "the day of the knife incident."  He testified that in the morning he went to school and then to his father's house.  He did not feel well and left about 3:00 p.m.  He denied remembering what he did or what happened after his return to school.  He denied recalling that Smith, Yip, Rocha, Wynter, or Tack testified at trial.

When the prosecutor asked, "Did you stab Mr. Alexander to death?  Yes or no," defendant responded, "No."  He denied yelling, "Fuck him.  He had it coming" or saying, "This blood is making me horny.  I'm a man now."  Defendant denied that he tried to intimidate Quiroa; kicked his leg; made a stabbing gesture at him; or told him he had sex with Quiroa's mother.

DISCUSSION

**1.** *Mental Incompetency of Defendant to Testify Not Shown*

Defendant contends the trial court erred in failing to suspend trial proceedings and conduct a competency hearing before defendant testified, because defendant was unable to assist his counsel in a rational manner with his defense.  No error transpired.

In her pretrial evaluation, Dr. Rebecca Crandall opined that defendant was competent to stand trial.  During trial, based on its observation of and interaction with defendant and in light of Dr. Crandall's evaluation, the trial court declined to declare a doubt as to defendant's competency, which doubt is necessary for a competency hearing.  Substantial evidence supports the trial court's findings that defendant's outbursts outside the jury's presence, his erratic, perplexing behavior, and his initial decision not to testify were insufficient to call into doubt defendant's competency to stand trial.

a. *Competency to Stand Trial Background*

On March 27, 2014, during a pretrial conference not attended by defendant, defense counsel informed the trial court of his belief that defendant was mentally incompetent.  He explained, "I have visited [defendant].  He's been nonresponsive.

6

Today I attempted to speak with him. He is—he was nonresponsive. The deputy [sheriff] indicated today although compliant he was nonresponsive and . . . has had no communication with anybody." The court noted, "This is not the first time a doubt has been declared." The court declared a doubt as to defendant's mental competence, suspended the proceedings, and appointed Dr. Sanjay Sahgal to evaluate defendant for the defense.

On July 7, 2014, defendant refused to attend court. His counsel advised that he did not know why defendant was absent. He stated defendant has been "nonresponsive . . . he hadn't bathed, et cetera. When I saw him last, I would say three weeks or a month ago he was—we joked about him being back and making sure he was on his meds, et cetera, and not to put me through that again."

On July 21, 2014 defendant again was absent. His counsel explained that a jail deputy reported defendant had been refusing to leave his cell for any "appointment" and had "paint[ed] with his feces." He added that in early June, Dr. Sahgal e-mailed him a preliminary opinion that defendant was malingering. The court ordered defendant extracted from his jail cell for the July 29 hearing.

On July 29, 2014, defendant was not present. The trial court appointed Dr. Crandall in place of Dr. Sahgal, who had not given the court an evaluation of defendant.

On August 19, 2014, defendant appeared in court. The parties stipulated to a determination of defendant's competence based on Dr. Crandall's evaluation. Dr. Crandall opined defendant was mentally competent. The court agreed, found defendant competent to stand trial, and reinstated the criminal proceedings. Defense counsel then made a record of his communications with defendant. He stated defendant had not attended court during the three or so preceding months; defendant "hardly leaves his cell to make visits with his attorney"; and he "essentially had no communication" from defendant prior to raising an issue as to his mental competence.

Defense counsel added that when he spoke with defendant earlier that day, defendant understood their conversation. When he spoke about the importance of taking his medication, defendant responded that there might be an issue with his medication.

7

Counsel advised the court "if [defendant] can't stay on his medications and doesn't see me in jail, he doesn't show up in court, at some point I am going to have to declare a conflict. There would be no communication between [defendant] and [me] and doing it pro bono becomes difficult." He added, "I know as long as [defendant] is on his medication, he can fully cooperate and we can get through the trial and he even testified in his last trial." When counsel asked defendant to tell the court whether he still wanted counsel to represent him, defendant responded that he did.

On September 18, 2014, at a pretrial hearing, when defense counsel declared a conflict and advised the trial court that defendant wanted a different attorney, defendant interjected and asked about his statutory speedy trial rights. Asked whether he wanted defense counsel to continue representing him, defendant confirmed to the court that he did. The court then held an in-chambers discussion with defense counsel. Afterward, the court discussed with defendant the time frame for trial. Defendant responded that his questions had been answered.

During trial, defendant engaged in various separate outbursts outside the presence of the jury. The first occurred at the hearing on motions in limine. When defendant began discussing the shower "towel" incident, the trial court interrupted and directed him to speak with his counsel. A few moments later, as the parties were discussing discovery matters, defendant interjected and said, "Liar." At the conclusion of the hearing, defense counsel stated that defendant had not made any outbursts during his first trial but during "this early stage of the trial there's already been I want to say at least three outbursts he's made with the court." The court noted, "all his outbursts took place outside the jury's presence." Counsel agreed and added he did not know the reason for his outbursts. The court commented that defendant had received the most recent dose of his medication, which was by injection.

The court advised defendant that the jury could view such outbursts against him. Defense counsel stated, "[Defendant] understands we are in trial. He understands I'm his attorney. He understands the procedure. It just makes me nervous that if his outbursts are the result of a mental issue, that someone might . . . come back later and say, well, he

8

was doing all these outbursts. Counsel should have been aware that something else was going on." The court responded, "I think you would have the cause to be more nervous if, in fact, [defendant] had not been addressed by medical professionals with respect to his mental status. Okay. But there is a significant record of such intervention, and the record should reflect that I e-mailed Dr. 'Teotoloff,' [the jail facility's medical director,] yesterday afternoon [and h]e investigated the medication that [defendant] is receiving. He consulted with fellow doctors in the psychiatric unit. And so this is [not] an area that somehow is just being ignored." The court directed defense counsel to alert the court if he thought that defendant "has seriously decompensated."

Defendant's outburst concerning his knife also transpired outside the jury's presence. After the court ruled that the prosecution could show the jury the knife itself rather than just a photograph, the prosecutor advised, as Detective Shafia, the investigating officer, was bringing the knife back to counsel table, defendant said, "That's my knife, can't I have it back for my collection?"

Following the testimony of Herrera, defense counsel informed the court that on the previous day, defendant told him he thought about committing suicide and harming counsel. He related that he did not know if defendant was joking.

Prior to testimony from the prosecution's final witness, the court advised that defendant needed to consult with his counsel and make his own decision whether to testify. Defendant responded that he understood. After that witness testified, the court granted a recess to enable defense counsel to speak with defendant before he gave his answer. Following the recess, counsel requested an additional recess. He related that defendant indicated he did not wish to testify although he had explained that the defense of imperfect self-defense would not be available unless he testified. Defendant told the court he did not want to testify. The court granted another recess to allow counsel to seek legal advice from other attorneys.

After the recess, the court again asked whether defendant wanted to testify. He responded, "I have testified before, and the record is there in the proceeding, so my posture is I'm not testifying today." The court asked, "Do you understand that with

9

respect to your earlier testimony, [the jury] will not see or have a copy of that testimony?" The court then asked, "Now that I've informed you that your prior testimony will not be available to this jury, is it still your decision not to testify?" Defendant responded, "Yes, sir."

Defense counsel voiced his belief that a doubt existed as to defendant's mental competence. He stated defendant's responses to his questions were illogical and unreasonable and "cast a doubt as far as [defendant's] ability to cooperate with his defense." In declining to declare a doubt, the court found defendant was attentive in court and had understood what the court said. Defense counsel mentioned defendant "blurted something to Mr. Rocha" while Rocha was testifying, and that Rocha discussed defendant's outburst in his testimony.[3]

Defense counsel argued that defendant's insistence that he testify for defendant showed "a direct disconnect with the court proceedings" and that defendant had mentioned "Patton." Pointing out that, absent defendant's testimony, there could be no imperfect self-defense, he argued, "There has to be a disconnect between what I'm explaining to him and what he's receiving, because we went through this process one time before, and he understood it and he participated, and it resulted in a hung jury . . . ." He concluded defendant's behavior could only be explained by irrational thinking.

The court asked, "[D]o you understand that if you do not testify, your attorney will not be able to present, as he has characterized it, and is accurate, any meaningful defense? Do you understand that?" Defendant replied, "There's evidence from the last trial." The

---

**3** The record reflects that Rocha testified defendant talked about losing his dignity, doing something to get it back, and "people were naked in the Bible." On cross-examination, counsel asked whether Rocha had "added things since last year when [he] testified" during the first trial. Rocha responded, "[W]alking around naked." An off-the-record discussion then transpired between defense counsel and defendant. Afterward, Rocha stated, "See, that's what I'm talking about. How is that the—" Defense counsel then asked, "You know King David is a reference to the Bible, right?" Rocha replied, "Okay, yes." The record does not disclose any statement made by defendant. In later proceedings outside the presence of the jury, defense counsel acknowledged he did not know what defendant said.

court explained that the evidence from the first trial would not be before the jurors in this trial and they would not hear such evidence unless he testified. Referring to his counsel, defendant responded, "He knows what I said." The court clarified, "[I]f you don't say it at this trial, he cannot make any reference to what you said earlier. That would be a violation of the law. In order for him to tell your side of the story, as you did at the previous trial, you have to testify. Do you understand what I've said?" Defendant said, "Yes." He replied "no" when asked, "Based on that explanation by the court, does that cause you to change your mind with respect to testifying at this trial?"

After the noon recess, the court invited defense counsel to address whether there was substantial evidence of incompetence. Comparing defendant's current conduct with his conduct in the first trial, counsel suggested defendant might be experiencing medication "decompensation." He stated that defendant's level of cooperation had varied over their two-year relationship, depending on his level of medication. He argued that the initial expert, Dr. Sahgal, opined defendant was incompetent. He also argued that his own observations of defendant's behavior were inconsistent with the reports defendant was receiving his medication. He stated that in the morning, defendant expressed to counsel his feeling about killing himself but in the afternoon he felt better. He added that defendant never mentioned harming counsel until this trial. Counsel further argued that defendant's statements to the court, Rocha, and Shafia contradicted his advice and defendant's request that counsel testify for him was inconsistent with his understanding at the first trial.

Defense counsel further argued that defendant did not understand his explanation of the importance of testifying and that his refusal to testify amounted to "judicial suicide." He mentioned, but did not describe, defendant's altercation while in custody during lunchtime. He concluded defendant's "mental state" was the only explanation for the difference in his conduct in the first and second trials.

The trial court responded that no substantial evidence of incompetence had been presented. "The court over the lunch hour . . . read Dr. Crandall's report generated August 14, 2014. That report included representations that at times during her interview

11

with [defendant] that his cooperation—and to quote on page 4 of that report with the interviewer, would wax and wane, and that at times he would engage in silly behavior. The doctor furthermore observed that his affect was bizarre. And in light of those observations, nonetheless, the doctor concluded that he was competent to stand trial." The court characterized defendant's comments to the court outside the presence of the jurors as reasonable and stated it was mindful of case law holding "periodic outbursts or inappropriate statements certainly do not constitute sufficient or substantial evidence of incompetence." The court asked whether defendant understood defense counsel would not be able to argue his defense before the jury if defendant did not testify. Defendant responded, "Yes, I do." Although finding his decision not to testify "perplexing" and "inexplicable," the court concluded it was defendant's choice to exercise that right, which exercise did not constitute substantial evidence of incompetence. The court also concluded the difference in defendant's behavior with his counsel over several years did not constitute substantial evidence of incompetence, particularly in view of Dr. Crandall's evaluation.

The court, however, reserved its ultimate ruling on the issue of substantial evidence of mental competency and proposed that trial be recessed for a couple of days for further evaluation by Dr. Crandall rather than suspending trial for a full hearing under section 1368. Defense counsel agreed but without withdrawing his request for a "1368" hearing. Before a recess commenced, defendant asked if he could testify in both English and Spanish. When the court replied that he could, defendant stated he would testify primarily in English. The court then ruled, "The court does not find that there are sufficient grounds to postpone this trial should [defendant] testify and choose to testify. The crux of the decision . . . possibly involv[ing] Dr. Crandall in reevaluating [defendant] is a recognition by the court that his failure to testify presents significant problems for defending him. But if he conveys at this time that he is willing to testify under the [circumstances] that I would allow him to testify in both English and Spanish, the court is making a finding that there is nowhere near sufficient evidence to find that there is substantial evidence of incompetency, let alone a justification to delay the trial."

12

The next morning, defendant acknowledged that March 14, 2012, was "the date of the incident with the knife." He testified that in the morning, he went to his father's house and returned to the dormitory that afternoon. He denied remembering anything after his return. When asked whether viewing his previous testimony would refresh his memory, defendant responded, "You can say what I said. You can remind me, yeah." The court instructed defendant, "The law only permits you to be shown a document. You read it silently to yourself to help you remember what happened on that particular day. If that would help your memory, then you're free to read it to yourself." After his counsel provided him with several transcript pages, defendant stated, "It says right here, 'As you walk into the—'" The court interrupted and directed him to "[s]top. You need to read that to yourself. And if it helps you remember what happened that day, then you let us know. So just keep reading that page and about the next three or four pages." Defendant responded, "It's so long ago, I don't remember." Counsel prompted, "I saw that you only looked at one page . . . . Can you read the other three pages and see if that helps remind you?" Defendant testified he did not remember what happened or hearing the testimony of Smith, Yip, Rocha, Wynter, or Tack.

Defense counsel renewed his request for a competency hearing and advised that he did not know whether defendant's lack of memory was feigned or due to mental issues. He added that during the lunch break, defendant paced back and forth in his cell about half an hour, which conduct defense counsel had never before seen. The court declined to declare a doubt about defendant's competence, finding his claimed lack of memory was feigned. The court explained it was "not prepared to pursue this matter further insofar as [defendant] has testified with precise and accurate recall up until the day when this murder took place. He was able to remember earlier in the day that he had watched TV with his father, that he had gone to purchase some food, that he was unable to eat the food. There is a wall being created now proximate to the killing of Mr. Alexander that I do not find to have anything to do with his ability to recall. It's pretty obvious he simply doesn't want to go into this area."

13

After defendant's testimony, defense counsel renewed his concern about defendant's competence. The court was not persuaded and found defendant's lack of testimony regarding the circumstances of Alexander's killing was due to defendant's choice not to address what happened. The court explained, "[Defendant], in areas very proximate to the time of March 14, 2012, was able to recall with great detail what transpired between himself and Mr. Alexander. He was able to remember with great detail the mode of transportation, the number of buses that he took, what he and his father did on the day of the killing, what he ate that afternoon, that the court has observed [defendant] respond that he doesn't recall, doesn't remember, I don't find that those representations are genuine or truthful. They appear to the court as simply [reflecting defendant's] not wanting to discuss the crucial subject matter that has brought [him] into these circumstances. I think the record should further reflect that when he was asked if reading the material would refresh his memory, there was a very cursory review of the material. He did not in any way, shape, or form carefully review the testimony line by line, which comports with the court's observation that he simply did not want to discuss this particular area. I think the record is quite clear that when he felt comfortable answering a question at any point during direct or cross-examination, he answered it."

    b. *Applicable Legal Principles*

An accused is incompetent to stand trial if, due to "mental disorder or developmental disability," he is "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) The due process standard is "'whether [the accused] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" (*Dusky v. United States* (1960) 362 U.S. 402.)

Section 1368 sets forth the criteria for a competency hearing. "When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing." (*People v. Jones* (1991) 53 Cal.3d 1115, 1152.) "Evidence is 'substantial' if it raises a reasonable doubt about the defendant's

competence to stand trial." (*Ibid*.) "When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. [Citations.]" (*Id*. at p. 1153.) "Evidence that merely raises a suspicion that the defendant lacks present sanity or competence but does not disclose a present inability because of mental illness to participate rationally in the trial is not deemed 'substantial' evidence requiring a competence hearing." (*People v. Deere* (1985) 41 Cal.3d 353, 358, disapproved on a different point in *People v. Bloom* (1989) 48 Cal.3d 1194, 1228, fn. 9.) Further, "'more is required to raise a doubt [of competence] than mere bizarre actions [citation] or bizarre statements [citation] . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to the defendant's ability to assist in his own defense [citation].'" (*Deere*, at p. 35.)

In short, the litmus test is whether the defendant has the capacity to understand the nature of the proceedings and to assist his counsel in his defense in a rational manner. A trial court's ruling regarding a competency hearing is entitled to great deference because "'[a]n appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign [mental incompetence] and delay the proceedings, or sheer temper.'" (*People v. Danielson* (1992) 3 Cal.4th 691, 727, overruled on a different point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

c. *Evidence Defendant Feigned Mental Incompetence Substantial*

Defendant contends the trial court erred in not holding a competency hearing prior to his taking the stand, because his mental competence was called into question by his irrational decisions and bizarre behavior. He first points to his "failure to grasp, in spite of multiple attempts by court and counsel, the very fundamental importance of his testimony to his defense" of imperfect self-defense, which was further evidenced by his decision to "[stop testifying ] short of the very matter that made his testimony necessary

15

to his defense," i.e., the circumstances of Alexander's murder. The fatal problem in defendant's contention lies in not acknowledging the trial court's findings that his failings were due to feigning and unwillingness on the part of defendant rather than the product of any mental incompetence, which are supported by substantial evidence.

Prior to defendant's testimony, the trial court confirmed defendant understood his refusal to testify about Alexander's killing would preclude an imperfect self-defense, the strategy embraced by defense counsel. Despite such understanding, defendant did not testify concerning the circumstances of the killing, claiming an inability to recall what happened, the testimony of eyewitnesses, and his prior testimony. Based on its personal observation of and interaction with defendant, the trial court found defendant feigned his claimed inability to recall and he simply was unwilling to recount the circumstances of the killing. (*People v. Rogers* (2006) 39 Cal.4th 826, 849 [insufficient ability to assist in own defense not shown by mere memory loss regarding charged crime].) In view of the above, we conclude defendant's unwillingness to assist defense counsel in establishing his strategy of imperfect self-defense does not equate with an inability on the part of defendant to do so. (*People v. Medina* (1995) 11 Cal.4th 694, 735 ["Defendant's cursing and disruptive actions" reflecting "unwillingness to assist in his defense, but" not necessarily relevant to "his *competence* to do so"].)

Additionally, parting ways with his counsel was a calculated decision on defendant's part. While his claim of imperfect self-defense won him a hung jury in the first trial, defendant no doubt believed he could not count on acquittal based on that strategy alone in this trial, because that jury had split 10 for murder and 2 for manslaughter. He apparently thought, mistakenly, he could have his cake and eat it too by presenting his prior testimony regarding imperfect self-defense through the transcript of the prior trial, which tactic would foreclose a direct challenge to his credibility on cross-examination if he testified in this trial. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1163-1164 [not presenting mitigating evidence to possible death penalty not incompetency]; *People v. Taylor* (2009) 47 Cal.4th 850, 864 [defendant's "'disturbingly inept'" strategy did not "cast serious doubt on the trial court's finding that he knew what

16

he was charged with and the nature of the trial"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1065 [failure to "attempt to develop a persuasive case in mitigation" was a reflection of per se defendant's lack of legal training, not mental incompetence].)

Defendant's related contention that his bizarre behavior prior to his testimony raised a doubt as to his mental competency also is unsuccessful. He fails to point to a "'substantial change of circumstances or . . . new evidence' casting a serious doubt on the validity" of the competence finding made by the trial court on August 19, 2014, mere months before trial commenced on December 3, 2014. (*People v. Jones*, *supra*, 53 Cal.3d at p. 1153.) Specifically, defendant does not describe or otherwise identify any behavior on his part following the initial finding of competency that raised a serious doubt as to his ability to understand the nature of the proceedings and assist counsel in a rational manner. (*People v. Medina*, *supra*, 11 Cal.4th 694, 734-735 [refusal to cooperate with counsel insufficient to justify second competency hearing]; *People v. Marshall* (1997) 15 Cal.4th 1, 33 ["bizarre actions or statements" insufficient "to raise a doubt of competency"].)

The record in fact reveals substantial evidence to the contrary. The trial court's finding of no significant change in defendant's conduct is supported by Dr. Crandall's evaluation and the court's personal observation of and interaction with defendant. In arguing for a full competency hearing, defense counsel repeatedly compared defendant's conduct during the first trial with that during his second trial. Dr. Crandall's competency opinion, however, took into consideration defendant's behavior prior to such evaluation. Further, the trial court was well suited to assess defendant's conduct as an eyewitness in both trials, because that court and the trial court presiding over the first trial are the same. (*Jones*, *supra*, 53 Cal.3d 1115, 1153 [where competency hearing already held, "trial court may appropriately take its own personal observations into account in determining whether there has been some significant change in the defendant's mental state"].) The trial court also confirmed defendant in fact was receiving his medication. Additionally, the concern about defendant's ability to comprehend the fatal consequence of his not

testifying to an imperfect self-defense strategy was resolved when defendant agreed to testify.

## 2. *Exclusion of Defendant's Prior Inconsistent Testimony Not Error*

Defendant contends his rights to present a defense and to due process (U.S. Const., 14th Amend.) were abridged when the trial court erroneously excluded evidence of his prior testimony in the first trial as substantive evidence of his mental state in stabbing Alexander, i.e., his mistaken belief he acted in self-defense. No error, and thus no constitutional violation, occurred. His prior testimony was not admissible as a prior inconsistent statement, because his trial testimony neither directly nor indirectly contradicted his prior testimony.

### a. *Proceedings Regarding Exclusion of Defendant's Prior Testimony*

Defendant denied remembering what happened to Alexander, the testimony of the eyewitnesses, and his prior testimony in the first trial. On cross-examination, when the prosecutor confronted defendant several times with his prior testimony, he maintained he did not remember any of that testimony. On redirect examination, his counsel asked whether he remembered a certain portion of his prior testimony. The court sustained objections to the question as calling for hearsay and falling outside the scope of cross-examination.

During a jury instruction discussion the next morning, defense counsel argued he should have been permitted to impeach defendant with his prior inconsistent statements during redirect examination. The prosecutor argued that request should have been made during redirect examination. The court ruled the attempted impeachment was proper and allowed both sides to reopen. Defense counsel read aloud defendant's prior testimony that he got the knife from a tool box in his closet and kept it at his waist because he thought he needed protection from being raped; he entered the office with the knife because he was scared; and upon entering the office, he thought Alexander was "coming for" him. When Alexander stood up, defendant thought he was going to take the knife away and kill him. In the face of such fear, defendant took out the knife and stabbed

18

Alexander. Defendant testified he did not remember anything about Alexander's death or his prior testimony in that regard.

In view of such impeachment, the court tentatively ruled that it would instruct the jury on voluntary manslaughter based on imperfect self-defense. The court took a noon recess before the cross-examination of defendant.

After recess, the court reversed its ruling and announced that the court would strike the impeachment testimony and omit a voluntary manslaughter instruction. The court explained defendant's testimony from the first trial was irrelevant and therefore inadmissible, because a witness's prior inconsistent statement is not admissible for its truth. Defense counsel disagreed, arguing defendant's prior inconsistent statements were admissible for their truth. The court instructed the jury that the court had ruled defendant's testimony elicited on reopened direct examination was inadmissible and the jury was to disregard it.

b. *Applicable Legal Principles*

"Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."[4] (Evid. Code § 1235.) "Prior inconsistent statements are admissible under this provision to prove their substance as well as to impeach the declarant." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1144.)

"The 'fundamental requirement' of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony. [Citation.] Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.]" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219.) "Inconsistency in effect, rather than contradiction in express terms, is the

---

[4]     Extrinsic evidence of a witness's prior inconsistent statement shall be excluded unless the witness was given an opportunity to explain or deny the statement while testifying; the witness "has not been excused from giving further testimony in the action"; or "the interests of justice otherwise requires." (Evid. Code, § 770.)

test for admitting a witness's prior statement." (*People v. Green* (1971) 3 Cal.3d 981, 988, overruled on a different point in *People v. Chavez* (1980) 26 Cal.3d 334, 357.) When a witness's evasive testimony "constitute[s] an *implied denial*" of the substance of the prior statement, the evasive testimony is "*materially* inconsistent" with the prior statement, and the prior statement becomes admissible for its truth under section 1235. (*Green*, at p. 989, italics added.) A trial court's ruling under section 1235 is reviewed for abuse of discretion. (*People v. Cowan* (2010) 50 Cal.4th 401, 462.)

c. *Feigned Failure to Remember Not Requisite Inconsistent Statement*

The trial court did not abuse its discretion in excluding defendant's prior testimony from his first trial to establish the substance of such testimony.[5] Substantial evidence supports the court's finding that defendant's testimony during this trial was not inconsistent with that prior testimony. During his direct testimony, defendant acknowledged that March 14, 2012, was "the date of the incident with the knife," but denied remembering what happened to Alexander or his prior testimony from the first trial, during which he had testified he stabbed Alexander under a mistaken belief of self-defense. The trial court concluded that defendant was being deliberately evasive in testifying that he did not remember. Contrary to defendant's claim, his deliberately evasive testimony did not constitute an "implied denial" of his prior testimony, because, when viewed in context, his denial of recollection was not "materially inconsistent" with his prior testimony. Defendant's interaction with defense counsel and the trial court during his testimony reveals defendant's strategy was to reaffirm his prior testimony about stabbing Alexander in a mistaken belief of self-defense while, at the same time, depriving the jury of the opportunity to view his demeanor and thereby judge his credibility and the prosecutor of the opportunity to cross-examine him, perhaps to his detriment, if he were to testify before the jury. When defense counsel asked if

---

[5] That the trial court's reasoning was faulty, i.e., inconsistent statements are not admissible for their substance, is of no moment. "It is axiomatic that we review the trial court's rulings and not its reasoning." (*People v. Mason* (1991) 52 Cal.3d 909, 944.)

defendant's testimony from the prior trial would refresh his memory, defendant requested that counsel read the testimony to the jury, stating, "You can say what I said.  You can remind me, yeah."  Although the court directed defendant to read the document to himself, defendant began reading his prior testimony out loud until stopped by the court.  After being forestalled from presenting his prior testimony to the jury, defendant feigned reading such testimony before testifying he did not remember what happened to Alexander, the testimony of the eyewitnesses, or his prior testimony.  (Cf.  *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 415 [witness's "claimed failure of recollection was actually a deliberate evasion *tantamount to a denial*," italics added].)

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.


21